COMMONWEALTH vs. RAE HERMAN MANDEVILLE.

Suffolk. February 3, 1982. — June 3, 1982.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, & O'CONNOR, JJ.

*Homicide. Evidence,* Hearsay, Relevancy and materiality, Redirect examination, Admissions and confessions, Privileged communication. *Error,* Harmless. *Constitutional Law,* Admissions and confessions, Waiver of constitutional rights, Assistance of counsel, Presumptions and burden of proof. *Jury and Jurors. Practice, Criminal,* Question by jury, Instructions to jury, Capital case.

At the trial of a murder case there was no error in the exclusion of testimony by the victim's husband as to telephone conversations in which the victim had told him that a person other than the defendant was threatening her and testimony by a police officer that when the husband had been told of his wife's murder he had said that he would "take care of" this person, where the testimony respecting the victim's statements of the threats made to her was hearsay and where the police officer's testimony about the husband's apparent suspicion was irrelevant as having no tendency to prove that the person suspected was the murderer. [396-399]

At the trial of a murder case the judge erred in excluding certain testimony offered by the defendant in explanation of a statement elicited from him on cross-examination, but the error was harmless inasmuch as the testimony related to a collateral matter and the evidence of the defendant's guilt was substantial. [399-400]

In the circumstances there was no error at the trial of a murder case in the admission of statements made by the defendant to police officers on the way to the police station after his arrest. [401-404]

It is within the discretion of a judge at a criminal trial to permit the stenographer's notes of the testimony of a witness or witnesses to be read to the jury. [404-406]

This court did not consider whether, at the trial of indictments charging murder and assault with intent to murder, the judge's charge on malice and on intent improperly shifted the burden of proof to the defendant where no objection to the charge had been made and where the only issue seriously disputed at the trial was the identity of the person who had committed the crimes. [406-408]

Statements made by a criminal defendant to a person employed as a staff
psychologist at a health center, who had been the defendant's teacher
at a college with no affiliation to the health center, were not privileged
under G. L. c. 233, § 20B, or confidential under 42 U.S.C. § 4582
(1976), where the staff psychologist was not a "psychotherapist"
within the meaning of G. L. c. 233, § 20B, and where the defendant
was not a patient at the health center. [408-411]

Reviewing the record of a murder trial pursuant to G. L. c. 278, § 33E,
this court concluded that neither minor improprieties in statements by
the prosecution nor evidence of the defendant's impaired mental con-
dition after the murder warranted a new trial or a reduction of the
verdict. [411-413]

INDICTMENTS found and returned in the Superior Court
on April 27, 1976.

The cases were tried before *McGuire*, J.

*William J. Leahy* for the defendant.

*Michael J. Traft*, Assistant District Attorney (*Peter J.
Muse*, Legal Assistant to the District Attorney, with him)
for the Commonwealth.

HENNESSEY, C.J.    The defendant appeals his convictions
of murder in the first degree and armed assault with intent
to murder.    He claims error with respect to the following
matters:   (1) the exclusion of evidence which allegedly tend-
ed to implicate another person in the murder; (2) the exclu-
sion of the defendant's proffered explanation of a statement
elicited from him on cross-examination; (3) the admission in
evidence of statements made by the defendant to the police
following his arrest; (4) the reading to the deliberating jury
of the stenographer's notes of the testimony of three prose-
cution witnesses; (5) the jury instructions on the elements of
malice and intent; and (6) the admission of allegedly confi-
dential communications between the defendant and a psy-
chologist.    In addition, the defendant asks this court to
order a new trial or reduce the verdict pursuant to G. L.
c. 278, § 33E, on the grounds that there was improper
argument by the prosecutor and that there was substantial
evidence of the defendant's mental impairment.    For the
reasons stated below, we affirm the judgments.

The evidence at trial tended to show that at approximately 10:30 P.M., on February 14, 1976, the defendant entered the apartment of his girl friend, Emily Kincaid, found her in bed with another woman, and shot them both. Emily was killed, and the other woman, Donna Lucas, was seriously wounded. Donna Lucas testified at trial but could only give a general description of the assailant, who was apparently masked, and could not identify the defendant. Among the witnesses for the Commonwealth was Charles St. Jean, a neighbor of the defendant. He testified that at 9 P.M., on February 14 the defendant came to St. Jean's apartment and asked to borrow St. Jean's .22 caliber derringer. The defendant took the gun and eight bullets, and before leaving fired one shot into the wall. The spent projectile recovered from the wall of St. Jean's apartment had markings that were similar to those found on the projectiles recovered from Emily Kincaid's body. St. Jean also testified that the following day the defendant came to his apartment with the gun looking "white and really jumpy," and told him that "[h]e blew his girl friend away, and a guy that was with her in bed." St. Jean then told the defendant to take the gun and the bullets and leave. The gun was never recovered.

Mr. Paul Conley, an attorney who was employed as a staff psychologist at the Dimock Community Health Center, and who was an acquaintance of the defendant, also testified for the Commonwealth.[1] Mr. Conley testified that on the afternoon of February 15, 1976 (the day after the murder), the defendant telephoned him at his home and said that he was thinking of committing suicide by taking an overdose of drugs. When asked why he was planning to kill himself, the defendant indicated to Mr. Conley that he had found his girl friend in bed with another woman and that he had killed them both. At Mr. Conley's suggestion, the defendant went that evening to Mr. Conley's home to talk.

---

[1] Mr. Conley was admitted to the Bar after the events to which he testified and prior to the time of trial.

There the defendant again told Mr. Conley that he had shot his girl friend and another woman, and said that the shooting had occurred on the previous evening at 10:15 P.M. After they discussed the situation for several hours, the defendant returned to his apartment, and a few hours later he swallowed approximately seventy antihistamine pills. The following morning the defendant again called Mr. Conley, and Mr. Conley arranged to have the defendant go to the Harvard Community Health Center. From there he was transferred to Glenside Hospital for psychiatric treatment. A mental health worker at the hospital, John Schafer, testified that during the defendant's stay at the hospital the defendant told him "he had killed his girl friend and her friend was a vegetable." There was also testimony given by an emergency medical technician, Thomas Seeley, who accompanied the defendant to Glenside Hospital. Seeley testified that, when the defendant was asked why he was going to the hospital, he replied, "I am going to beat it," and that the defendant asked him whether if he "told a shrink that he had committed a crime, would the shrink in turn have to notify the police department."

The defendant took the stand and denied that he had shot Emily Kincaid or Donna Lucas. He stated that on the evening of the murder, he went to a drugstore to look at magazines, took a walk, and went to bed. The next morning he went to Emily Kincaid's apartment, saw the bodies of the two women, and left. He admitted to having a key to the apartment at the time. He testified that he then went to St. Jean's apartment in order to borrow a gun to kill someone; however, he left without the gun. The defendant admitted talking to St. Jean, Mr. Conley, the emergency medical technician, and the mental health worker, but he denied making the admissions that they attributed to him.

1. *Evidence Tending to Implicate Another Person in the Crime.*

The defendant sought to have Paul Kincaid, who was Emily's estranged husband at the time of the murder, testify as to certain telephone conversations between Paul and

Emily. Paul would have testified that Emily, on several occasions during the two or three weeks prior to the murder, telephoned Paul and stated that one O'Brien would not leave her apartment and was threatening her, and that she asked Paul to help her in ejecting him. The Commonwealth objected on the ground that the testimony was inadmissible as a husband-wife conversation, and the judge excluded it on that ground. See G. L. c. 233, § 20. Also excluded was Paul's testimony that, when Sergeant Griffin, an investigating officer, told Paul of his wife's murder, Paul stated that he would "take care of" O'Brien, and "get that son of a bitch."

With respect to the conversations between Emily and Paul Kincaid, the defendant argues that the Commonwealth failed to show that the conversations were private, and that the burden of proving that a husband and wife conversation was private rests on the objecting party. Cf. K.B. Hughes, Evidence § 125, at 109 & n.33 (1961). We need not decide this issue, for even if we assume that the ground relied on by the judge was erroneous, we conclude that the evidence was not admissible for other reasons, stated below. It is the general rule that no error will be found when an incorrect specific objection is sustained, if some other proper ground for exclusion exists. *Rubin* v. *Arlington*, 327 Mass. 382, 385 (1951). 1 J. Wigmore, Evidence § 18, at 342 (3d ed. 1940).[2] Where the evidence is inadmissible on one ground, the fact that the judge relied upon some other, incorrect, ground for excluding the evidence should not require reversal, since a retrial would probably only result in the exclusion of the evidence on the proper ground.

---

[2] *McGivern* v. *Steele*, 197 Mass. 164 (1908), is not to the contrary. There the judge excluded statements of a deceased person, erroneously relying on R. L. c. 175, § 66 (now appearing, as amended, in G. L. c. 233, § 65), when in fact the statements would have been admissible (as testimony recorded under oath) if the proponent had been given the opportunity to lay the necessary foundation. Accordingly, the error was held to be reversible.

The evidence of what Emily said to Paul on the telephone was inadmissible hearsay. The defendant does not call to our attention any exception to the hearsay rule that might apply here, and we find none.[3] The statements made by Emily to Paul were also excludable on relevancy grounds for the same reasons that we discuss below in relation to Paul Kincaid's statement to Sergeant Griffin.

The statements made by Paul Kincaid to Sergeant Griffin when he was told of his wife's murder, that he would "take care of" O'Brien, were properly excluded as irrelevant and tending to mislead the jury.[4] The conclusion to be drawn from those statements, that Paul suspected O'Brien as the murderer, would have no tendency to prove that O'Brien was actually the murderer. See *Commonwealth* v. *Vitello*, 376 Mass. 426, 440 (1978) ("Evidence is relevant if it renders the desired inference more probable than it would be without the evidence"), and authorities cited. See also Proposed Mass. R. Evid. 401 (July, 1980). At most, it was an expression of opinion concerning O'Brien's involvement in the murder, and regardless of its hearsay character, was inadmissible for that reason. *Commonwealth* v. *Hesketh*, *ante* 153, 161-162 (1982). *Commonwealth* v. *Ross*, 339 Mass. 428, 435 (1959). Such an opinion would only have served to confuse the jury.

The defendant argues that the exclusion of the evidence concerning O'Brien deprived him of the opportunity to

---

[3] No effort was made at trial to qualify the statements as spontaneous exclamations, or even as present sense impressions (the latter not having been recognized in Massachusetts law). The statutory exception for statements of deceased persons does not apply to criminal cases. *Commonwealth* v. *Gallo*, 275 Mass. 320, 335 (1931). See G. L. c. 233, § 65.

[4] The evidence was excluded on a general objection made by the Commonwealth. The defendant at trial did not rely on any particular theory of admissibility, and on appeal he now contends that the evidence was admissible to prove the state of mind of Paul Kincaid, or, in the alternative, that the evidence was admissible as a spontaneous exclamation. In light of our holding, we need not address these arguments. See *H.E. Fletcher Co.* v. *Commonwealth*, 350 Mass. 316 (1966); *Palm* v. *Kulesza*, 333 Mass. 461 (1956) (sustaining of a general objection is not error if the evidence is excludable on any ground).

present his defense, thereby denying him a fair trial. In support of this argument he cites various cases holding that a defendant may introduce evidence to show that another person committed the crime. E.g., *Commonwealth* v. *Keizer*, 377 Mass. 264, 268 (1979); *Commonwealth* v. *Graziano*, 368 Mass. 325, 329 (1975); *Commonwealth* v. *Murphy*, 282 Mass. 593 (1933). The weakness of the defendant's argument is that only the threats allegedly made by O'Brien to Emily had any relevance to this end, and these statements were hearsay and lacked any particular indicia of reliability. Contrast *Chambers* v. *Mississippi*, 410 U.S. 284 (1973). No other evidence was proffered which in any way connected O'Brien with the crime. Even if the evidence of O'Brien's threats was not objectionable as hearsay, it would nevertheless be too conjectural and misleading properly to be put before the jury. In *Commonwealth* v. *Abbott*, 130 Mass. 472, 475-476 (1881), it was said that "[t]he existence of ill feeling as a motive for the commission of crime will not alone justify submitting to a jury the question of the guilt of a person entertaining such feeling. It becomes material only when offered in connection with other evidence proper to be submitted, showing that the person charged with such ill feeling was in fact implicated in the commission of the crime." See *Commonwealth* v. *Trefethen*, 157 Mass. 180, 191 (1892). Such evidence is "too weak in probative quality," *Commonwealth* v. *Geraway*, 355 Mass. 433, 441, cert. denied, 396 U.S. 911 (1969), and would merely tend to mislead the jury.

2. *The Defendant's Explanation of His Testimony Elicited on Cross-examination.*

On cross-examination the defendant testified that he told St. Jean that he wanted to borrow his gun to kill someone. When the prosecutor asked whom he had said he wanted to kill, the defendant answered "Tom O'Brien." The defendant then admitted that he had never met O'Brien, and the prosecutor asked, "So you wanted to kill a person you had never met? Is that right?" The defendant answered, "That is correct." On redirect the defendant attempted to

explain that he had said this to St. Jean because he had been told by Emily Kincaid that O'Brien had threatened her. The testimony was excluded, and the defendant's rights were saved.

We agree with the defendant that he should have been permitted to explain his statement. It is well established that a witness may explain, modify, or correct damaging testimony that was elicited on cross-examination. *Commonwealth* v. *Ferreira*, 373 Mass. 116, 130-131 (1977). *Commonwealth* v. *Fatalo*, 345 Mass. 85 (1962). *Commonwealth* v. *Smith*, 329 Mass. 477, 479-481 (1952). *Mahoney* v. *Gooch*, 246 Mass. 567, 570 (1923). See *Commonwealth* v. *Hicks*, 375 Mass. 274, 277-278 (1978). The effect of the defendant's testimony on cross-examination was to suggest that the defendant had no apparent reason for wanting to kill O'Brien, thus leaving the impression that the story was a product of fabrication. The defendant had a right to show that he did have a reason for wanting to kill O'Brien. It makes no difference that the defendant's explanation was based on the out-of-court statements of Emily Kincaid previously excluded as hearsay. Those statements were relevant to explain the defendant's state of mind, a matter that had been put in issue by the prosecutor.

Although we conclude that the exclusion of the defendant's explanation offered on redirect examination was improper, we nevertheless think that in the circumstances the error was harmless. Because the judge had earlier excluded the evidence of O'Brien's alleged involvement in the murder, the defendant's testimony related to a subject that was wholly collateral to the issue then being tried. Compare *Commonwealth* v. *Fatalo, supra*; *Commonwealth* v. *Smith, supra*. The defendant's testimony was also contradicted by St. Jean's account of the conversation, and in general was not such as to inspire belief. Moreover, the evidence of the defendant's guilt was substantial. We therefore conclude that any prejudice to the defendant arising from this error would not have affected the result.

3. *Statements Made to the Police Following the Arrest.*
The defendant was arrested in his apartment on February 23, 1976. On the way to the police station he answered questions about his activities on the weekend of the murder. At trial he unsuccessfully sought to exclude this evidence.

The defendant first claims that his rights under the Sixth and Fourteenth Amendments to the United States Constitution were violated when the police failed to secure the presence of his attorney prior to questioning him after his arrest. The police had been in contact with the defendant's attorney on two occasions in the week preceding the arrest, and on the earlier occasion (six days prior to the arrest), the attorney had told them that the defendant did not wish to speak to the police at that time.

The attorney's statement to the police six days prior to the arrest cannot reasonably be construed to apply to the day of the arrest. If a suspect is not in custody, a refusal to speak to the police does not thereby insulate him from all police interrogation for the indefinite future. The record does not indicate that the attorney or the defendant asked that the attorney's presence be secured at the time of the arrest. Compare *Escobedo* v. *Illinois*, 378 U.S. 478 (1964). The defendant also argues that there is an independent right to the assistance of counsel at the time of an arrest. *Commonwealth* v. *Smallwood*, 379 Mass. 878, 883-884 (1980), however, is fatal to the defendant's argument. In *Smallwood*, we held that the issuance of a complaint and an arrest warrant does not constitute the commencement of "adversary proceedings" entitling a defendant to the assistance of counsel. *Id.* at 884, quoting from *Brewer* v. *Williams*, 430 U.S. 387, 401 (1977). See also *Commonwealth* v. *Simmonds*, *ante* 234, 237-238 (1982). In *Smallwood,* as here, the police knew that the defendant was represented by an attorney. The defendant's reliance on *Estelle* v. *Smith*, 451 U.S. 454 (1981), is misplaced and requires little comment other than to point out that in that case the defendant already had been indicted and counsel had been appointed at the time of the interrogation. Cf. *Edwards* v. *Arizona*, 451 U.S. 477, 480 n.7 (1981).

The defendant next contends that his statements to the police should have been suppressed because they were obtained in a manner contrary to the requirements of *Miranda* v. *Arizona*, 384 U.S. 436 (1966). When the defendant was arrested he was read his Miranda rights from a standardized card. The recitation of rights ended with the question, "Having these rights in mind, do you wish to talk to us now?" The defendant did not respond to the question, and no other questions were asked at that time. After putting on a jacket, the defendant was handcuffed, taken outside, and put into a police cruiser. Four police officers accompanied him in the car to the police station. During the questioning in the car, he "took the Fifth Amendment" to certain questions and answered others. At the end of the interrogation he was asked if he would agree to take a polygraph test, to which he responded that he wanted to consult an attorney.[5] The defendant does not dispute that the statements were voluntarily made.

Although the issue is a close one, we conclude that it was not error to admit the defendant's statements in evidence. The defendant contends that his failure to respond to the question read to him from the Miranda card constitutes an expression of a desire to remain silent, and that the police did not scrupulously honor this desire when they proceeded to question him in the car. He correctly states the law that, when an individual has indicated a desire to remain silent or consult an attorney, any questioning must cease, *Miranda* v. *Arizona*, 384 U.S. 436, 474 (1966), and the decision to cut

[5] The defendant testified on voir dire that he had requested to see his attorney immediately after he was given the Miranda warning. Although the trial judge did not make any findings of fact, the defendant in his brief states the facts, as to this event, according to the version given by the police, and we accept that version as true.

There was also evidence that the defendant had been drinking beer on the afternoon of the arrest. Sergeant Griffin, however, did not recall that he had observed any sign of intoxication on the defendant, and the defendant's testimony did not tend to refute this. The evidence is thus insufficient to support a finding that the defendant's mental capacity was impaired at the time of the arrest.

off questioning must be "scrupulously honored." *Commonwealth* v. *Brant*, 380 Mass. 876, 882, cert. denied, 449 U.S. 1004 (1980), quoting from *Miranda, supra* at 479. We do not agree, however, that the circumstances here indicate a desire on the part of the defendant to remain silent. The defendant's momentary silence, in the absence of other more specific questioning, simply does not warrant the conclusion that the defendant wished to assert his right to remain silent.[6]

If it were determined that a wish to remain silent had been expressed, we might agree with the defendant that a violation of his Fifth Amendment rights would be demonstrated. Where a desire to remain silent was made known to the police, it is infrequent that a valid waiver of constitutional rights will be found when only a short interval existed between the time when a defendant asserted his right to terminate questioning and the time when interrogation was subsequently resumed.[7] In the instant case, however, where there was no indication that the defendant wanted not to be questioned, we think that the Commonwealth's burden of proving a knowing and intelligent waiver of rights is somewhat lighter. To be sure, the burden remains a heavy one. *Miranda* v. *Arizona*, 384 U.S. at 475. In *Miranda*, the United States Supreme Court stated that "a valid waiver will not be presumed simply from the silence of the accused

---

[6] The testimony of Sergeant Angelo LaMonica, who gave the defendant the Miranda warning, suggests that the question, "do you wish to talk to us now," was recited from the standardized card without the expectation of a reply.

[7] E.g., *Edwards* v. *Arizona*, 451 U.S. 477, 484-485 (1981); *Commonwealth* v. *Gallant*, 381 Mass. 465, 467-468 (1980); *Commonwealth* v. *Brant*, 380 Mass. 876, cert. denied, 449 U.S. 1004 (1980); *Commonwealth* v. *Jackson*, 377 Mass. 319, 321-329 (1979); *Commonwealth* v. *Taylor*, 374 Mass. 426 (1978). See *Brewer* v. *Williams*, 430 U.S. 387 (1977); *Michigan* v. *Mosley*, 423 U.S. 96 (1975). To be contrasted is *Commonwealth* v. *Watkins*, 375 Mass. 472 (1978), holding· that statements made in close temporal proximity to the defendant's request for counsel are admissible where the defendant on his own initiative stated to the police that he wished to make a statement. Accord, *Edwards* v. *Arizona, supra*.

after warnings are given or simply from the fact that a confession was in fact eventually obtained." *Id.* See *Tague* v. *Louisiana*, 444 U.S. 469 (1980) (per curiam). On the other hand, the Supreme Court has made it equally clear that "the question of waiver must be determined on 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *North Carolina* v. *Butler*, 441 U.S. 369, 374-375 (1979), quoting from *Johnson* v. *Zerbst*, 304 U.S. 458, 464 (1938).

When the defendant was arrested, he did not appear to be intoxicated or upset. He asked to see the arrest warrants, and, when presented with them, he examined them. Most important, however, is the fact that in response to certain questions he "took the Fifth Amendment" and refused to answer. Likewise, when asked if he wanted to take a polygraph test, the defendant responded that he first wanted to consult an attorney. We think that this selective assertion of Fifth and Sixth Amendment rights exhibits a knowing and intelligent decision to waive those rights as to the questions that he did answer. When an individual "takes the Fifth Amendment" as to certain questions and voluntarily answers other questions, the conclusion is almost inescapable that the answers are made with full knowledge of the right to remain silent. Similarly, the defendant's refusal to take a polygraph test without first consulting an attorney suggests that he understood his right to the assistance of counsel. We conclude that, in the circumstances of this case, the Commonwealth has met its burden of proving that the defendant "knowingly and intelligently waived his privilege against self-incrimination." *Miranda, supra.*

4. *The Reading of Testimony to the Jury.*

After the jury had deliberated for some time, they requested to hear the testimony of three witnesses, St. Jean, Seeley, and Schafer, regarding the conversations that they had with the defendant. Over the objection of the defendant, the judge allowed the entire testimony of the three witnesses to be read to the jury. After the testimony was read, the judge cautioned the jury not to give that testimony any

added emphasis.[8]  The defendant contends that it was error
to allow the testimony to be read, on the ground that undue
emphasis was placed on that part of the Commonwealth's
case.

The issue is one of first impression in this Commonwealth.
In *Commonwealth* v. *Ricketson,* 5 Met. 412, 429 (1844), it
was held that whether to receive further evidence upon re-
quest of the jury after their deliberations had commenced is
wholly within the discretion of the trial judge.  The precise
question before us now was raised in *Ricketson,* but was not
decided.  See also *Commonwealth* v. *Allen,* 256 Mass. 452,
455 (1926) ("In the absence of the stenographer the testi-
mony could not be read to the jurors, and the judge was
right in replying that they must depend upon their memo-
ries of what had been testified").  We note that the great
majority of other jurisdictions hold that whether to permit
the reading to the jury of stenographer's notes of testimony
is within the sound discretion of the trial judge. See Annot.,
50 A.L.R.2d 176 (1956).  See also III ABA Standards for
Criminal Justice, Trial by Jury 15-4.2(b) (1980).  We too
hold that it is within the judge's discretion to permit the tes-
timony of a witness or witnesses to be read to the jury.  We
emphasize, however, that such discretion should be exer-
cised with caution.  The reading of testimony may indeed
overemphasize certain aspects of the case. See *United States*
v. *Patterson,* 644 F.2d 890, 898 (1st Cir. 1981); *United States*
v. *DePalma,* 414 F.2d 394, 396 (9th Cir. 1969), cert. denied
396 U.S. 1046 (1970); *Henry* v. *United States,* 204 F.2d 817,
821 (6th Cir. 1953).  Here, however, both the direct and

---

[8] The judge instructed the jury as follows:  "[The court reporter] has
read back to you those portions of the testimony requested by you.  Of
course, it's your recollection of what was said on the witness stand when
the witnesses were present that would warrant your attention, and that
you will not give any added emphasis because I have allowed this exami-
nation and cross examination to be read back to you, because it is the most
recent thing you've heard.  You will, of course, consider in your delibera-
tions all of the evidence that you feel is warranted in your opinions, and
you will give that evidence which you heard such weight as you feel is
warranted in your deliberations."

cross-examinations of the witnesses were read in their entirety, and a cautionary instruction was given after the testimony was read. In the circumstances we find no error in the judge's decision.

5. *The Instructions to the Jury.*

The defendant argues that the judge's charge to the jury improperly shifted to the defendant the burden of proof with respect to the element of malice, contrary to the law as stated in *Sandstrom* v. *Montana*, 442 U.S. 510 (1979). In particular, the defendant claims constitutional deficiency in that part of the judge's charge which stated, "[I]f you find that one has assailed another with a dangerous weapon likely to kill which does in fact destroy the life of the party assailed, the natural presumption is that he intended the death or great bodily harm."[9] We find no prejudicial error.

In a number of recent cases we have confronted the issue whether a particular jury charge impermissibly shifted to the defendant the burden of disproving malice.[10] In the instant case, no objection was made at trial to the charge on malice. We address the defendant's claim, however, pursuant to our broad powers under G. L. c. 278, § 33E. In other cases we have said that our expectations of the judge in charging the jury and of counsel in raising appropriate objections will differ depending on whether the constitu-

---

[9] Because we do not reach the merits of the defendant's constitutional claim here, it is unnecessary to reproduce in full the judge's charge to the jury on the element of malice. Ordinarily, though, "[a] jury charge must be considered as a whole, not by bits and pieces." *Commonwealth* v. *Gibson*, 368 Mass. 518, 527-528 (1975).

[10] *Commonwealth* v. *Drayton, ante* 39, 53 (1982). *Commonwealth* v. *Palmer, ante* 35 (1982). *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 277-278 (1982). *Commonwealth* v. *Richards*, 384 Mass. 396 (1981). *Commonwealth* v. *Chasson*, 383 Mass. 183 (1981). *Commonwealth* v. *Repoza*, 382 Mass. 119, 132-135 (1980). *Reddick* v. *Commonwealth*, 381 Mass. 398, 404-407 (1980). *Commonwealth* v. *Fitzgerald*, 380 Mass. 840, 844-846 (1980). *Commonwealth* v. *Callahan*, 380 Mass. 821, 822-826 (1980). *Commonwealth* v. *Medina*, 380 Mass. 565, 577-580 (1980). *Gibson* v. *Commonwealth*, 377 Mass. 539 (1979). *Commonwealth* v. *McInerney*, 373 Mass. 136 (1977).

tional principles governing the issue were developed at the
time the charge was given. *Commonwealth* v. *Chasson*,
383 Mass. 183, 188-190 (1981), and cases cited. The
defendant's trial took place in 1977, before *Sandstrom*,
*supra*, but after *Mullaney* v. *Wilbur*, 421 U.S. 684 (1975),
and *Commonwealth* v. *Rodriguez*, 370 Mass. 684 (1976),
the latter two of which also bear on the issue raised here.
See *Commonwealth* v. *Richards*, 384 Mass. 396 (1981);
*Commonwealth* v. *Callahan*, 380 Mass. 821 (1980). We
find it unnecessary to decide, however, whether the ap-
plicable constitutional principles were developed at the
time of the defendant's trial, or even whether, under any
standard of review, the jury charge was constitutionally of-
fensive.

The sole issue at trial was the identity of the murderer.
"The record reveals 'no issue of justification, mitigation, or
lack of intent on the part of the perpetrator.'" *Common-
wealth* v. *Pisa*, 384 Mass. 362, 363 (1981), quoting from
*Commonwealth* v. *Lee*, 383 Mass. 507, 513 (1981). No in-
struction on manslaughter was given, and the defendant
does not now argue that one should have been. "In such cir-
cumstances, the failure to object to the charge as to malice
cannot be attributed to inadvertence or lack of knowledge
of evolving constitutional doctrine. Rather, the failure to
object reflects a conscious choice of trial strategy by defense
counsel." *Commonwealth* v. *Pisa, supra* at 363, quoting
from *Commonwealth* v. *Lee, supra* at 512. See *Com-
monwealth* v. *Tameleo*, 384 Mass. 368, 370 (1981). Even if
the failure to object were attributable to lack of knowledge
of the law, as is contended, any error in the charge was
harmless, since the evidence did not support an inference of
manslaughter. The defendant, however, attempts to avoid
this pitfall by arguing that there was sufficient evidence of
mental impairment to raise an issue of mitigation, namely,
whether he was capable of deliberate premeditation. See
*Commonwealth* v. *Gould*, 380 Mass. 672, 680-683 (1980).
This argument fails for two reasons. First, the issue of
mitigation by reason of mental impairment was not raised

at trial and was not adequately presented for the jury's consideration. Second, even if the issue had been raised, it relates to the existence or nonexistence of deliberate premeditation, not malice. This court has never recognized mental impairment as a ground for distinguishing between malice and the lesser showing of intent that is necessary to support a manslaughter conviction. See *Commonwealth* v. *Gould, supra.* See also *Commonwealth* v. *Perry*, 385 Mass. 639, 648-650 (1982). The judge's instruction on malice was not such as would have confused the jury with respect to the burden of proof on deliberate premeditation.

The defendant also claims that the jury charge on the intent element of the indictment charging assault with intent to murder unconstitutionally shifted the burden of proof to him. However, as we have stated, the only issue seriously disputed by the parties was the identity of the assailant. The defendant cannot now argue error on the basis of a theory that was not presented at trial. *Commonwealth* v. *Lee, supra* at 512.

6. *The Communications Between the Defendant and Mr. Conley.*

Over the objection of the defendant, the judge allowed Mr. Conley to testify as to the conversations he had with the defendant on February 15 and 16, 1976. The defendant now claims that the testimony should have been excluded on the basis of G. L. c. 233, § 20B, or, alternatively, on the basis of 42 U.S.C. § 4582 (1976). We disagree.

General Laws c. 233, § 20B, grants to a "patient" the privilege of preventing a witness from disclosing any communications made between himself and his "psychotherapist." A "psychotherapist" is defined under the statute as "a person licensed to practice medicine who devotes a substantial portion of his time to the practice of psychiatry or a person who is licensed as a psychologist by the board of registration of psychologists; provided that such person has a doctoral degree in the field of psychology." G. L. c. 233, § 20B, as amended by St. 1977, c. 817. Mr. Conley was not

licensed to practice psychiatry or psychology, nor did he have a doctoral degree in either field. Although he was educated in the field of psychology, and was employed at the Dimock Community Health Center as a staff psychologist, this is not sufficient to qualify him as a "psychotherapist" within the meaning of G. L. c. 233, § 20B. The patient-psychotherapist privilege has never been recognized at common law. *Commonwealth* v. *Gordon*, 307 Mass. 155, 158 (1940). We are thus not inclined here to extend the patient-psychotherapist privilege beyond the bounds established by the Legislature. See *Usen* v. *Usen*, 359 Mass. 453, 457 (1971). Compare Proposed Mass. R. Evid. 503 (a) (July, 1980).[11]

The defendant nevertheless argues that Mr. Conley was an agent for a psychiatrist who worked at the center. However, § 20B provides that a patient may prevent a witness from disclosing "any communication, wherever made, *between said patient and a psychotherapist* relative to the diagnosis or treatment of the patient's mental or emotional condition" (emphasis supplied). The statute defines "patient" as "a person who, during the course of diagnosis or treatment, communicates *with* a psychotherapist" (emphasis supplied). We agree with the reasoning of the Appeals Court in *Commonwealth* v. *Clemons*, 12 Mass. App. Ct. 580, 586-587 (1981), that some confidential relationship must exist between a "patient" and a "psychotherapist" before the privilege can be invoked. Until that is established it is unnecessary to consider whether the statute should be judicially extended to an agent or assistant of the psychotherapist. There was no evidence to show that there were

---

[11] Rule 503 (a) of the Proposed Massachusetts Rules of Evidence might well produce a different result in this case, inasmuch as it defines "psychotherapist" as "(i) a person authorized to practice medicine in any state or nation, *or reasonably believed by the patient so to be*, while engaged in the diagnosis or treatment of a mental or emotional condition, including alcohol or drug addiction, or (ii) a person licensed or certified in any category as a psychologist or social worker under the laws of any state or nation, *or reasonably believed by the patient so to be*, while similarly engaged" (emphasis supplied).

ever confidential communications between the defendant and a "psychotherapist" at the center.

The defendant also alleges that the disclosure of his communications violated Federal law, 42 U.S.C. § 4582 (1976). See also 21 U.S.C. § 1175 (1976). Those provisions create a limited confidentiality for records of the "identity, diagnosis, prognosis, or treatment of any patient" which are maintained in connection with the performance of any alcohol or drug abuse program regulated or assisted by the Federal government. 21 U.S.C. § 1175(a) (1976) (relating to programs for drug abuse). 42 U.S.C. § 4582(a) (1976) (relating to programs for alcohol abuse). It was stipulated at trial that the Dimock Center, which employed Mr. Conley, was federally funded and therefore subject to the Federal regulations interpreting these laws.[12]

The regulations promulgated pursuant to §§ 1175 and 4582 define "patient" as "any individual (whether referred to as a patient, client, or otherwise) who has applied for or been given diagnosis or treatment for drug abuse or alcohol abuse . . . ." 42 C.F.R. § 2.11(i) (1981). The facts of this case indicate that the defendant was not a "patient" at the center when he made the incriminating statements to Mr. Conley. Although there was some suggestion that the defendant had problems with alcohol, he never participated in any program at the Dimock Center, and there is no showing that prior to the conversations he ever received treatment at the center with respect to alcohol or drug related problems. The defendant became acquainted with Mr. Conley as a student at a course taught by Mr. Conley at Middlesex Community College, which does not appear to have any affiliation with the Dimock Center. The defendant called Mr. Conley at his home, and was subsequently admitted to the Harvard Community Health Center and

---

[12] The record does not indicate whether the Dimock Community Health Center was subject to both of the Federal statutes or to only one of them. This makes no difference, however, since the statutes are similar in all material respects, and are both interpreted by the same set of regulations. 42 C.F.R. §§ 2.1 - 2.67-1 (1981).

later to the Glenside Hospital. Although Mr. Conley testified that the Dimock Center was closed when the defendant called and that otherwise he would have asked the defendant to come to the Dimock Center for psychiatric evaluation, we do not consider Mr. Conley's intentions to be material. If anyone's intentions here are material, they are the defendant's, and the record does not disclose any intent on his part to become a patient at the Dimock Center. The defendant's stated purpose in calling Mr. Conley was to ask if the beneficiary of a life insurance policy could obtain benefits if the death was caused by suicide. In short, it appears that when the defendant called Mr. Conley in search of psychiatric help, he was calling him as a teacher and an acquaintance, not as an employee of the Dimock Center.[13]

7. *Review Pursuant to G. L. c. 278, § 33E.*

The defendant asks this court to exercise its broad powers of review under § 33E to grant a new trial or reduce the verdict to murder in the second degree. See *Commonwealth* v. *Tavares*, 385 Mass. 140, 157-158 (1982), and cases cited. It is argued that an exercise of our § 33E powers is warranted for two reasons. First, the defendant contends that the prosecutor made impermissible statements in his closing argument to the jury. Second, he states that there was substantial evidence at trial of the defendant's mental impairment and that accordingly, under *Commonwealth* v. *Gould*, 380 Mass. 672 (1980), this court should either grant a new trial or reduce the verdict.

No objection was made to the allegedly improper portion of the prosecutor's argument. Our inquiry is therefore limited to determining whether the statements, when viewed against the background of the entire case, were so prejudicial as to result in a substantial risk of a miscarriage of justice. *Commonwealth* v. *Valliere*, 366 Mass. 479, 494 (1974). *Commonwealth* v. *Nordstrom*, 364 Mass. 310, 313-316 (1973).

---

[13] There was evidence that, at the time of the arrest, the defendant told the police that "Paul [Conley] was a good friend and a teacher and he went [to Conley's home] to discuss radios and insurance."

We have reviewed the arguments of the prosecutor and we find no impropriety of any significance. It is true that there was some misstating of the evidence on one matter. However, in that instance the inference that the prosecutor drew from his version of the facts would not have been weakened by a correct statement of the facts.[14] The other infractions by the prosecutor, if infractions they were, are so minor as to warrant no discussion. In any event, in light of the strong case against the defendant, we conclude that if there was any impropriety in the prosecutor's argument, it was not so prejudicial as to warrant a new trial. *Commonwealth* v. *Fitzgerald*, 376 Mass. 402, 416-424 (1978). *Commonwealth* v. *Earltop*, 372 Mass. 199, 203-204 (1977). *Commonwealth* v. *Nordstrom, supra* at 316.

The evidence of the defendant's mental impairment was also not such as to warrant the exercise of our § 33E powers.[15] The defendant did not claim any lack of criminal responsibility. He did not offer expert testimony as to his mental condition at the time of the murder. What testimony there was on the subject related to his mental condition *after*

---

[14] Donna Lucas had testified that her assailant wore a green Army-type jacket. The defendant on cross-examination stated that he wore a Navy pea coat on the day after the murder, but subsequently admitted to owning an olive-colored Army jacket. The prosecutor in his argument to the jury stated: "I asked him on cross examination . . . 'Do you have such a jacket?' 'Yes, I have.' Then he tried to cover it up by saying that he had a pea coat . . . ." Although the chronology of the testimony as stated by the prosecutor differed from the actual chronology at trial, the prosecutor's version was no more damaging than a correct statement of the evidence would have been. This suggests that the prosecutor's error was unintentional. The defendant also argues that the inference that there was a "cover-up" was unfair. Although the inference is at best a weak one, we do not find it to be unfair. See generally *Commonwealth* v. *Earltop*, 372 Mass. 199, 204-205 (1977) (Hennessey, C.J., concurring).

[15] Similar arguments based on *Commonwealth* v. *Gould*, 380 Mass. 672 (1980), have been made in several recent cases. *Commonwealth* v. *Brown, ante* 17, 32-33 (1982). *Commonwealth* v. *Prendergast*, 385 Mass. 625, 634-635 (1982). *Commonwealth* v. *Chubbuck*, 384 Mass. 746, 756-757 (1981). *Commonwealth* v. *Shelley*, 381 Mass. 340, 354-355 (1980). See *Commonwealth* v. *Perry*, 385 Mass. 639, 648-649 (1982).

the murder, and even that evidence fell far short of suggesting that he was incapable of deliberate premeditation.[16] Upon reviewing the entire case pursuant to our duty under § 33E, we conclude that it would be inappropriate to order a new trial or reduce the verdict.

*Judgments affirmed.*

---

[16] The evidence of mental impairment consisted primarily of the defendant's unsuccessful attempt at suicide by swallowing seventy antihistamine pills, and his subsequent suicidal thoughts while at the Glenside Hospital. The defendant himself, however, states that his suicidal thoughts were most likely a reaction to Emily's murder. We must therefore reject his assertion that this evidence is indicative of a state of mental impairment existing at the time of the murder.