COMMONWEALTH *vs.* PAUL K. STOCKWELL.

Plymouth. September 5, 1997. - October 22, 1997.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Homicide. Practice, Criminal,* Psychiatric examination, Assistance of counsel, Argument by prosecutor, Transcript of evidence, Instructions to jury, Capital case. *Evidence,* Photograph, Expert opinion. *Malice.*

Evidence at a murder trial, which revealed that the victim was manually strangled, was sufficient for the jury to conclude beyond a reasonable doubt that the defendant was guilty of murder in the first degree by reason of deliberate premeditation. [19]

At the trial of a murder indictment in which the defendant raised the issue of his criminal responsibility, the judge did not abuse his discretion in denying the defendant's motion requesting that his interview with the Commonwealth's psychiatrist, conducted pursuant to Mass. R. Crim. P. 14(b)(2)(B), be recorded on videotape. [19-20]

At a murder trial, the trial judge properly, in his discretion, admitted in evidence one of three photographs of the victim's body as it appeared when discovered nine days after the killing. [20-21]

At a murder trial in which the defendant raised the defense of lack of criminal responsibility, the Commonwealth's psychiatric expert was properly allowed to state his opinions and the jury could not have been misled by that testimony in view of the judge's correct instructions on capacity to form intent, premeditation, and criminal responsibility, and his admonitory instructions on the jury's evaluation of expert testimony. [21-22]

On an appeal from a conviction of murder in the first degree, the defendant did not demonstrate any ineffective assistance of counsel that created a substantial likelihood of a miscarriage of justice arising from defense counsel's treatment of the issue of deliberate premeditation. [22]

At a murder trial, no substantial likelihood of a miscarriage of justice was created by the prosecutor's improper argument and the judge's incorrect explanation of malice, where the errors pertaining to the third prong of malice were inconsequential, inasmuch as the jury specifically found deliberate premeditation and rejected the defendant's claim of mental impairment, on correct instructions concerning deliberate premeditation, the first prong of malice, and impairment. [22-24]

At a murder trial, the judge did not abuse his discretion in refusing to grant the jury's request for a transcript of various witnesses' testimony. [24]

At the trial of an indictment for murder in the first degree, the judge's instruction to the jury on manslaughter was adequate. [24]

INDICTMENT found and returned in the Superior Court Department on December 12, 1989.

A motion to videotape record a psychiatric examination was heard by *George N. Hurd, Jr.*, J.; a motion to suppress evidence was heard by *Cortland A. Mathers*, J.; and the case was tried before *John M. Xifaras*, J.

*James F. McNiff, II*, for the defendant.

*Robert C. Thompson*, Assistant District Attorney, for the Commonwealth.

GREANEY, J. Represented by new counsel on appeal, the defendant, Paul K. Stockwell, challenges his conviction by a jury in the Superior Court of murder in the first degree by reason of deliberate premeditation. We conclude that the conviction should be affirmed, and that the defendant is not entitled to relief pursuant to G. L. c. 278, § 33E.

Based on the governing standard (*Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 [1979]), the jury were warranted in finding the following facts. The victim was the defendant's eighteen year old companion and was approximately six weeks pregnant with his child. The defendant did not want the responsibility of a child, and was concerned about the effect it would have on his life. He and the victim argued over her having an abortion. He also argued with the victim about the clothes she wore, and the possibility that she was attracted to other men.

On Sunday, October 1, 1989, the couple drove to Nantasket Avenue in Hull in the defendant's car, took a walk on the beach, and were sexually intimate in the car. As they sat in the car, the defendant began to choke the victim who struggled, kicked the windshield, and beeped the horn. At one point, the victim escaped from the defendant's grasp and opened the door of the car, but the defendant restrained her, continued to choke her, and, according to the testimony, "held onto her until she was dead." The defendant said he knew the victim was dead "[w]hen she stopped kicking and fighting" him. The defendant drove his car with the victim's body in it to the end of a dead-end street in Brockton where he left her on the ground near some trash in an area thick with brush and, after crossing her arms, covered her with grass. Over the next several days, the defendant told a number of people and the police conflicting stories about the circumstances of the victim's disappearance. The victim's body was not discovered until October 10.

On that same day, the defendant told his best friend, Herb Soper, that on the previous Saturday night (September 30), he

had "thought about killing [the victim]," and that he had "made up his mind" to kill her the following day, Sunday, October 1.[1]

After the victim's body was discovered, the defendant telephoned Soper and said, "Remember, you don't know anything."

An autopsy of the victim's body revealed that death was caused by manual strangulation.[2] There was medical testimony that it would have taken from three to five minutes from lack of oxygen to kill the victim, but that time frame could have been prolonged if the pressure on her neck was interrupted by her resistance. There were scratch marks on the victim's neck that could have resulted from her own attempts to relieve the pressure on her neck. She also had other injuries consistent with a struggle, including bruises on her chest, arms, thighs, and back of her head.

1. The defendant argues that "[t]he simple absence of any evidence of any instrumentality whatsoever and of any significant bodily injury other than the asphyxiation itself precludes a finding beyond a reasonable doubt of finalization of deliberation, rendering as end result a resolve to kill that persisted through the moment of the actual killing." The jury were warranted in finding the facts set forth above. Based on those facts, the jury properly could have concluded beyond a reasonable doubt that the killing was not impulsive or unintended, as the defendant suggests, but rather was the product of the defendant's "deliberation, resolution, and action," *Commonwealth* v. *Parker*, 412 Mass. 353, 360 (1992), and, consequently, that he was guilty of murder in the first degree by reason of deliberate premeditation.

2. The defendant contended that he suffered from a mental impairment and that he lacked criminal responsibility. He moved before trial that his interview with the Commonwealth's

---

[1]The defendant also stated to the police following his arrest that he had "thought about killing [the victim] Saturday."

[2]During his testimony at trial, the medical examiner explained that manual strangulation may take three forms. These include where the aggressor's hands are placed on the victim's neck with the thumbs along the "Adam's apple"; where the crook of the aggressor's hand or arm is placed on the neck of the victim ("sleeper hold"); and where the aggressor's forearm is placed on the neck of the victim ("choke hold"). The medical examiner did not express an opinion as to which form of manual strangulation caused the victim's death, although he stated that the hemorrhaging of the victim's neck tissue was consistent with either the sleeper hold or the choke hold.

psychiatrist, Dr. Martin J. Kelly, conducted pursuant to Mass. R. Crim. P. 14 (b) (2) (B), 378 Mass. 874 (1979), and *Blaisdell* v. *Commonwealth*, 372 Mass. 753, 767-769 (1977), be recorded on videotape.[3] The trial judge held a hearing on the motion and denied it as "a matter of discretion." The defendant argues that the denial of the motion was an abuse of discretion. We disagree.

As grounds for his claim of error, the defendant contends that the judge's decision was motivated by a concern for who would pay for the production of the videotape. We do not view the judge's ruling as resting exclusively on this issue. The judge was informed that Dr. Kelly "disfavors the videotaping of [*Blaisdell*] examinations, feeling that persons behave differently when there is a videotape camera on. It becomes more of a show and not a psychiatric examination." The judge was familiar with Dr. Kelly as a witness and appears to have considered him to be objective. The judge noted that Dr. Kelly had "testified for defendants quite a few times." The defendant's trial counsel stated no special reason for wanting the examination recorded on videotape, expressing only the general view that it might be useful to have "some sort of record" to show "the extent to which [the] defendant released his [F]ifth [A]mendment right for the *Blaisdell* purpose." On the hearing conducted, we shall not disturb the judge's ruling.

3. We next discuss arguments concerning evidentiary matters at the trial.

(a) The judge admitted in evidence, over objection by the defendant's trial counsel, one of three photographs of the victim's body as it was discovered by the police nine days after the killing. The photograph was gruesome. It had debatable relevance to some of the issues at trial. "The admission of photographs is committed to the sound discretion of the trial judge, and we have rarely reversed a conviction because of the introduction of photographs of a victim." *Commonwealth* v. *Meinholz*, 420 Mass. 633, 635 (1995), and cases cited. The judge carefully instructed the jury that their verdict should not

[3]The defendant had seasonably notified the Commonwealth that he would present evidence that raised an issue as to his criminal responsibility. There was considerable evidence at the trial concerning the defendant's alleged mental impairment and testimony in the defendant's case by Dr. Gary G. Dube, a clinical psychologist, and a designated forensic psychologist, that the defendant was not criminally responsible at the time of the killing by reason of a "combination of mental illness and . . . impulse control disorder."

be influenced by the fact that any photographs admitted in evidence were unpleasant or gruesome. Another judge might have, in the exercise of sound discretion, excluded the photograph. There is, however, no basis for reversal in the judge's ruling.[4]

(b) The defendant takes issue with several portions of the testimony of Dr. Kelly to the effect that the defendant was criminally responsible. The defendant's trial counsel objected to some but not all of Dr. Kelly's criticized testimony. We perceive no error.

Dr. Kelly was properly allowed to define personality disorders, to opine that the defendant had an impulse control disorder, to state that the defendant's problems exhibited an antisocial orientation, and to indicate that the defendant's disorder did not constitute a mental disease or defect. See *Commonwealth* v. *Kappler*, 416 Mass. 574, 583 n.7, 584 (1993). Dr. Kelly's references in his testimony to bank robbers and career criminals to explain general psychiatric concepts involved in his diagnosis of the defendant did not amount to improper "bad character" evidence as the defendant contends. The references were illustrative only, and Dr. Kelly pointed out that, although a career criminal was one example of an antisocial personality, the defendant was not a career criminal. Dr. Kelly was properly permitted to express his opinion that the defendant had the capacity to form a specific intent, cf. *Commonwealth* v. *Cruz*, 413 Mass. 686, 690-691 (1992), and we do not view his testimony as blurring the distinction between psychiatric and legal concepts. Nor do we consider Dr. Kelly's testimony to have expressed his notions of legal principles that were in conflict with the governing law. The factual inquiries concerning a lack of criminal responsibility, and a defendant's capacity to possess the requisite state of mind to commit murder, are not identical, but they do have "substantial similarities." *Commonwealth* v. *Genius*, 387 Mass. 695, 699 (1982). Both the prosecution and the defense were able to present the full range of their contentions through their respective experts concerning the defendant's mental state at the time of the killing. The jury could not have been misled by Dr. Kelly's testimony in view of the judge's correct instructions on the capacity to form intent, premeditation, and criminal responsibility, together with

---

[4]The judge also did not commit an abuse of discretion when he allowed the jury to view the location where the victim's body was found.

admonitory instructions on the evaluation of expert testimony. See *Commonwealth* v. *Amaral*, 389 Mass. 184, 194-195 (1983).

4. The defendant contends that his trial counsel provided him with ineffective assistance because he failed in his summation adequately to address what the defendant claims were deficiencies in the prosecution's proof of deliberate premeditation. We consider the defendant's argument under the substantial likelihood of a miscarriage of justice standard. *Commonwealth* v. *Wright*, 411 Mass. 678, 681-682 (1992). No such likelihood exists.

The summation by the defendant's trial counsel did not suggest that the defendant was not seriously contesting premeditation. The defendant's trial counsel chose to emphasize the evidence suggesting the defendant's mental impairment and lack of criminal responsibility, and to leave primarily to the judge the discussion of the law concerning premeditation and the other elements of the crimes open to the jury for their consideration. This approach was certainly reasonable, see *Commonwealth* v. *Callahan*, 401 Mass. 627, 636 (1988), and, based on the proof at trial, and argument by the defendant's trial counsel that the defendant had "acted spontaneously" and "in a way that was driven by mental illness and his impulse disorder," the jury were made aware that the defendant claimed he had acted in a way which precluded premeditation.[5]

5. In statements to the police, the defendant admitted that he had choked the victim, but maintained that he had only placed a "sleeper hold" on her, and that he had detected a heartbeat in her chest, which he thought was "cute," as he drove his car to Brockton where he abandoned the victim's comatose body. In her summation, the prosecutor asked the jury categorically to reject this claim. She further stated that, if the jury "decide[d] to accept [the defendant's] half-baked story," they could find him guilty of premeditated murder because "choking [the victim] was an act, the plain and strong likelihood [of which] was death or grievous bodily harm." In this fashion, the prosecutor presented to the jury the improper theory that the defendant could be convicted of premeditated murder in the first degree on the basis of third prong malice.

---

[5]There is also an argument that the defendant's trial counsel was derelict in not arguing in his summation that the jury had the option of convicting the defendant of murder in the second degree. The contention is weakly presented and lacks merit. The jury were instructed on a possible verdict of murder in the second degree (along with a possible verdict of manslaughter).

The defendant complains about the prosecutor's impropriety, and he also protests the judge's instructions on malice. The instructions contained the statement that "[m]alice aforethought refers to a frame of mind, which includes not only anger, hatred, and revenge, but also every other unlawful and unjustifiable motive," and the statement that, in addition to an unexcused specific intent to kill or an unexcused, specific intent to do grievous bodily harm, malice also included "an unexcused intent to do an act creating a plain and strong likelihood that death or grievous bodily harm would follow." The defendant now argues that the combination of the prosecutor's argument, and the malice instructions quoted above, undermined his "sleeper hold" claim and would have led the jury to convict him of premeditated murder without finding a specific intent to cause the victim's death. The defendant's trial counsel did not object to the prosecutor's statements or to the criticized portions of the judge's instructions. We review these imperfections at the trial as to whether they created a substantial likelihood of a miscarriage of justice. See *Wright, supra.* No such likelihood exists.

The prosecutor should not have made her statements, and the judge's instructions contain inappropriate explanations of malice.[6] The jury were advised before the trial began, and in the final instructions, that the issues in the case were not to be decided on the summations of counsel, and that they were to take the law from the judge. The judge correctly defined deliberate premeditation, and the first two prongs of malice, and he told the jury that they could consider evidence of the defendant's mental impairment on whether he acted with deliberate premeditation or with either of the first two prongs of malice. Cf. *Commonwealth* v. *Kozec*, 399 Mass. 514, 517 (1987) (instructions may mitigate any prejudice in final argument); *Commonwealth* v. *Amico*, 15 Mass. App. Ct. 650, 652 (1983) (new trial not required where prosecutor intruded on judge's function of explicating the law, and judge instructed jury that

---

[6]The trial occurred in October, 1989, before *Commonwealth* v. *Eagles*, 419 Mass. 825, 836 (1995) ("frame of mind" language often used in defining malice should thereafter be omitted from jury instructions) and *Commonwealth* v. *Judge*, 420 Mass. 433, 441 (1995) (deliberately premeditated murder requires a specific intent to cause death, a requirement that necessarily excludes the mental state involved in third prong malice). It is fair to say that many jury instructions given prior to 1995 in murder cases contained the imperfections involved in these instructions.

his statements of the law controlled). The defendant's arguments on appeal are governed by the decisions holding that, even if the defense is primarily based on evidence of mental impairment, any error pertaining to the third prong of malice is inconsequential when the jury have specifically found deliberate premeditation and have rejected a claim of impairment on correct instructions concerning deliberate premeditation, the first prong of malice, and impairment.[7] See *Commonwealth* v. *Mello*, 420 Mass. 375, 391 (1995); *Commonwealth* v. *Wallace*, 417 Mass. 126, 134-135 (1994); *Commonwealth* v. *Costa*, 414 Mass. 618, 627-628 (1993). See also *Commonwealth* v. *Judge*, 420 Mass. 433, 441-442 (1995).[8]

6. The defendant also claims that the judge erred in refusing to grant the jury's request, during deliberations, for a transcript of various witnesses' testimony. Whether to permit the jury to read the testimony of a witness is within the sound discretion of the judge. *Commonwealth* v. *Mandeville*, 386 Mass. 393, 405 (1982). There is always a risk that the reading of testimony may overemphasize certain aspects of the case, *id.*, and the judge is in the best position to weigh this risk. The judge did not abuse his discretion.

7. In his pro se supplemental brief, the defendant argues that the judge's manslaughter instruction was so confusing that the jury were impeded from fairly considering manslaughter as a possible verdict, and that there was incorrect instruction on "battery manslaughter." No objection was made to the manslaughter instruction. The instruction informed the jury that they could find the defendant guilty of manslaughter if they found that he had committed a battery that caused the victim's death and did so without justification or excuse. When considered in the context of the entire charge, the instruction was adequate.

---

[7]The defendant's argument is not substantially advanced by reliance on the "frame of mind" language which would not constitute an independent ground for reversal. See *Commonwealth* v. *Richardson*, 425 Mass. 765, 769 (1997).

[8]The Commonwealth in its brief cites *Commonwealth* v. *Judge, supra*, in support of upholding the defendant's conviction, but asks us to reconsider our determination in the *Judge* decision that third prong malice cannot support a finding of deliberately premeditated murder. The Commonwealth argues, at length, that our determination is wrong. We are not persuaded by the Commonwealth's argument and decline to make any revision of the principles stated in the *Judge* opinion.

8. The facts of this case, as they were found by the jury, do not warrant relief pursuant to G. L. c. 278, § 33E.

*Judgment affirmed.*