COMMONWEALTH *vs.* JOSE PEREZ.

Hampden. January 5, 1970. — April 15, 1970.

Present: WILKINS, C.J., CUTTER, KIRK, SPIEGEL, & REARDON, JJ.

*Search and Seizure. Arrest. Homicide. Evidence,* Relevancy and materiality; Opinion: expert. *Practice, Criminal,* Charge to jury. *Words,* "Suspicion," "Consistent with."

A motion to suppress as evidence a blood-covered sweater and other clothing of a defendant indicted for a particularly bloody murder, on the ground that the clothing had been seized by police without a warrant, was properly denied where it appeared that within six hours of discovery of the murder a man giving his name only as "Joe" and giving no address left the clothing with the manager of a cleaning establishment not far from the scene of the murder, pointing out the blood stains on the sweater, and that upon request by the police about eight hours after discovery of the murder the manager voluntarily gave the clothing to them. [298]

Where it appeared in a murder case that a police officer without a warrant arrested the defendant for the murder and that after the arrest the officer seized gloves the defendant was wearing, and the defendant made certain statements at the police station, it was held that the arrest was not rendered unlawful, or the admission in evidence of the gloves and statements error, in that the officer had told the defendant that he was under arrest on "suspicion" of murder or because after the gloves were seized and the statements made the defendant was booked for "vagrancy" and a complaint therefor issued which was not supported by any evidence and eventually was dismissed for lack of prosecution. [299–300]

A police officer without a warrant who arrested a defendant at a cleaning establishment on "suspicion" of murder of the owner of a hardware store about three days after the murder, when the defendant presented claim checks for a blood-covered sweater and other clothing left at the establishment within six hours of discovery of the murder, had probable cause to make the arrest, and the arrest was lawful, where it appeared that by the time thereof the defendant had admitted ownership of the clothing, and that the officer then knew that the murderer had entered the store by a rope hanging from a skylight and that blood, rope fibers similar to the fibers of the rope found in the store, and particles of putty-like material had been found on the sweater. [300–301]

In a murder case, a statement in an affidavit accompanying an application for a search warrant for the defendant's apartment, that a search warrant had been obtained "to confiscate certain blood stained clothing" of the defendant from a cleaning establishment, was not clearly shown to have been a misrepresentation, and did not render the search warrant for the apartment invalid. [301–302]

Although a judge's findings of fact after a hearing on a murder defendant's motions to suppress recited that a police officer arrested the defendant for "suspicion of the commission of a felony," the use of the word "suspicion" did not imply a finding of a lack of probable cause so as to render the arrest unlawful since the judge said that he was "satisfied that what was done here was reasonable" and denied the motions. [302]

At a trial for murder committed in a store which the murderer had entered by a rope hanging from a skylight, there was no error in the admission of testimony that when the defendant was shown the rope he averted his eyes and that when he was accused of sliding down the rope and killing the victim he put his head in his hands. [303]

Conviction of the defendant of murder in the first degree of the owner of a hardware store which the murderer had entered by a rope hanging from a skylight was warranted by circumstantial evidence, principally evidence of the similarity between bloodstains, rope fibers, putty, paint chips, and brass particles found on the defendant's clothing and such materials found in the hardware store, and evidence that when arrested the defendant was wearing new gloves almost identical to a glove of an unusual type found near a river and connected to the murder scene through the presence of such materials on the glove. [303–304]

In a murder case, frequent use by a chemist of the phrase "consistent with" in referring to the fact that expert analysis showed that various materials on the defendant's clothing were similar in their physical or chemical characteristics to materials found at the scene of the crime did not destroy the probative value of the chemist's testimony and render it incompetent. [304–305]

After a murder case had been submitted to the jury with a charge on the issues of circumstantial evidence and proof beyond a reasonable doubt largely drawn from *Commonwealth* v. *Webster,* 5 Cush. 295, 319–320, nothing in the trial judge's own language in response to the jury's request for further instructions on such issues derogated from the definitions in the *Webster* case. [305]

THREE INDICTMENTS found and returned in the Superior Court on May 5, 1967.

The cases were tried before *DeSaulnier, J.*

*Kent B. Smith* (*S. Thomas Martinelli* with him) for the defendant.

*Matthew J. Ryan, Jr.,* District Attorney (*Leonard E. Gibbons,* Assistant District Attorney, with him) for the Commonwealth.

KIRK, J. The defendant, Jose Perez, was tried under indictments charging murder in the first degree, armed robbery, and breaking and entering in the nighttime with intent to commit a felony. The jury returned verdicts of guilty on all three indictments, with the recommendation that the death penalty be not imposed. The case is before us on the defendant's appeals under G. L. c. 278, §§ 33A–33G. He assigns as error the denial of his motions to suppress evidence and for directed verdicts, certain findings of fact made by the judge, and a supplementary charge given the jury in response to a question.

We summarize the evidence. On Tuesday morning, January 3, 1967, about 1:45 A.M., the body of Charles Alpert, seventy-one years of age, was discovered by police in his hardware store at 1860 Main Street, Springfield. Alpert had left his home about 9 P.M. Monday night to check on the store. When he had not returned by midnight, his wife called the police. The police went to the store, and saw that the lights were on and that both the front and rear doors were unlocked. A rope was hanging from a skylight above the center of the store. A pane of glass was missing from the skylight. The police observed behind a counter, a safe, the dial of which had been pried off. A crowbar was in front of the safe. Alpert's body lay in a pool of blood behind the counter, to the rear of the store. He had received multiple blunt-force injuries to the head, causing seventeen wounds, fractures of the skull and nose bones and hemorrhage and laceration of the brain. Near his body was a claw hammer which had blood and hair on it. Alpert's wallet was not on his person or in the store.

Officer Persico, the policeman who discovered the body, testified that he saw five or six bloody footprints leading from the body toward the rear door. Deputy Chief McCarthy, who arrived about 2 A.M., saw a "[f]ew little marks like steps." The medical examiner, who arrived after the deputy chief, testified that the footprints which appeared in colored slides shown to the jury were "probably [h]is," because he "was the only one who got that close,"

and he had blood on his shoes. The body had not been touched or examined by anyone until the medical examiner arrived. The time of death was estimated at approximately 10 P.M. on Monday, January 2, 1967.

On Tuesday morning, January 3, at some time between 7 and 8 A.M., a man brought a blue velour sweater and three shirts to Norman Sorrell, the manager of the Carew One-Hour Cleaners at 2225 Main Street, Springfield. The man pointed out to Sorrell bloodstains on the blue sweater, and asked if they could be removed; Sorrell told him that they could be. Sorrell made out two claim slips on which he identified the man only as "Joe." A few minutes later, Abraham Kay, the owner of the Carew Cleaners, visited the shop, and Sorrell asked Kay to bring him some special blood remover.

At 8 A.M. that morning, police detectives began calling cleaning establishments in Springfield to request them to report any bloodstained clothing. When they called Kay, he told them of the clothes at the Carew Cleaners. The police asked if they could pick up the clothes, and Kay consented. Kay called Sorrell and told him to put the clothes to one side until the police arrived. At 9:30 A.M., Lieutenant Moriarty and Detective Tighe arrived at the Carew Cleaners and identified themselves. Sorrell took the clothes from under the counter and gave them to the officers. The police officers had no warrant, although they knew the District Court was open. They took the clothes to the police station, where Deputy Chief McCarthy put them in plastic bags and placed them in a cabinet. On Thursday, January 5, they were taken to the State police laboratory in Boston by Detectives O'Connor and Sears.

On the morning of Friday, January 6, Detective O'Connor applied for a search warrant. The affidavit in support of the application stated that the blue sweater and the three shirts were at the Carew Cleaners. The return on the warrant stated that a search of the cleaners was made on January 6, and that the clothes were taken pursuant to

the warrant.   Both O'Connor and Sears knew that the clothes were in Boston.

Commencing Wednesday, January 4, Lieutenant Moriarty and Detective Tighe kept watch on the Carew Cleaners for the man who had left the clothes.   On January 5 they learned that the State police chemist, in addition to the blood on the blue velour sweater, had determined that there were also rope fibers and particles of a granular material on the sweater.   At 3:30 P.M. the next day, Friday, January 6, the defendant Perez entered the Carew Cleaners and gave two slips to a female employee behind the counter.   The woman nodded to the detectives, indicating that the slips were for the seized clothing.   Sorrell, however, shook his head, indicating that the defendant was not the man who had left the clothing.[1]   When told that the shirts were not ready, the defendant left the shop.   Lieutenant Moriarty watched for a moment and, after observing that no one had accompanied Perez, called to him to return.   The defendant complied, and Moriarty asked him if the claim slips were his. The defendant said they were.   Moriarty then asked him what the slips were for, and the defendant described the blue sweater and the shirts.   Moriarty thereupon identified himself as a police officer, told the defendant that he was under arrest on "suspicion of the murder of Charles Alpert," and warned him of his rights.

The police arrived with the defendant at the police station about 3:45 P.M., and he was again advised of his rights. He said that he did not want to talk to a lawyer, but wanted to talk to one Packard, his parole officer.   The defendant spoke in broken but understandable English. He again told the police that the claim slips were his, and said that the blood on his shirt came from a fight he had been in a few nights before.   He told the police that he lived at 47 Bradford Street.   The clothes he was then wearing, including a pair of new black gloves, were taken from him.

---

[1] Sorrell testified that he knew the defendant and knew his name, and that the defendant was not the man who had left the shirts.   The defendant testified that he had left the shirts at the cleaners.

Deputy Chief McCarthy and three other officers left the station at 4 P.M. for Perez's residence. Detective Tighe remained with the defendant, who asked him to call someone who spoke Spanish and also asked him for Packard's telephone number. They were unable to reach Packard. Perez asked if he were being held for the killing "in the north end." He said that he stayed home every night because he was on parole. He also told Tighe that two Puerto Ricans had tried to rob him a few nights before, and had kicked and punched him, and that his nose had bled onto his blue sweater.

Deputy Chief McCarthy returned with clothing taken from the defendant's closet. Tighe related the foregoing conversation to him. McCarthy asked Perez what clothes he was wearing when he received the bloody nose. Perez pointed to a pair of black trousers and a pair of black shoes. These were segregated and placed in separate plastic bags, and later sent to the State police laboratory.

On January 10, 1967, one Landry, while working near the bank of the Connecticut River in Springfield, found a portion of a wallet containing papers bearing the name of Charles Alpert. As a result of this discovery, the police searched the area, and on January 12, found a black left-hand glove on a log near the river. The glove was also sent to the State police laboratory.

Joseph V. Lanzetta, the State police chemist, examined Perez's clothing, the clothes worn by Alpert, the glove found on the river bank and samples of various materials taken from the hardware store. On the blue velour sweater he found a heavy concentration of stains caused by human blood, type A, which was the blood type of both Alpert and the defendant. He also found fibers which microscopic examination showed to be manila rope fibers consistent in color and soiling with the fibers of the rope found hanging from the skylight. The fibers in both instances were brownish-yellow, but soiled with a black material which Lanzetta could not identify. He also found on the sweater some particles of a yellow-white granular material, which

were "similar in color, in appearance, and stained in the same manner as the outer portion of the glazing compound on the window or skylight."

On the defendant's black trousers Lanzetta found bloodstains, type A, and fibers that "were similar in color, in type, and in staining" with the fibers from the rope. He found also a white granular material similar in appearance to the putty or glazing compound from the skylight. X-ray diffraction tests produced similar results with both materials. On the defendant's black shoes Lanzetta found "a fairly large strip of white granular material" which produced X-ray diffraction test results similar to the putty in the skylight. Examination of the strip showed it to be consistent with having been pressed against ribbed glass, as the putty in the skylight had been. On the upper portion of the shoes Lanzetta found blood smears of insufficient quantity to enable him to determine whether the blood was human. He found no bloodstains on the bottom parts of the shoes. On the soles and heels Lanzetta found brass particles, which were on the average a little larger than a pinhead. Microscopic examination and X-ray diffraction tests showed the particles to be similar to brass particles from the dial of the safe, and to brass filings from the floor under a key-making machine in the hardware store.

Lanzetta found in addition several paint chips on the soles and heels of the shoes, which he compared microscopically with paint samples from the hardware store. A single-layered green paint chip from one of the shoes was in Lanzetta's opinion consistent in color and thickness with the top layer of paint from the safe. Paint chips from the shoes consisting of two layers, reddish brown over black, were found to be similar in color and in sequence of layers to the bottom two layers of paint on the safe. Paint chips from the shoes consisting of four layers, green, white, green and white, corresponded to the outer four layers of paint from the safe. A four-layered chip from one of the shoes, blue, white, tan and black, was similar in color and sequence of layers to the bottom four layers of paint on the safe. A

blue-green "globule" of paint on one of the shoes was consistent with samples taken from a spattering of paint on the floor of the hardware store. Other paint chips taken from the shoes could not be matched with paint in the store.

On the surface and lining of the black glove found near the river Lanzetta found stains of human blood, type A. There were brass filings on the middle finger of the glove which were similar to the brass filings from the key machine and to filings found on the handle of the claw hammer. Lanzetta found a paint chip of two layers on the glove, white and green, which was similar in color and appearance to the paint on the safe. Yellowish fibers in the webbing between the fingers of the glove were similar to fibers from the rope, and white granular material was similar in appearance and texture to the glazing compound on the skylight. In addition, Lanzetta found on the glove a few blue cotton fibers which microscopic examination revealed to be "similar in color and type" to the fabric of the defendant's blue velour sweater.

Other evidence will be stated as necessary in the course of the opinion.

1. The judge held a day-long voir dire on the defendant's motions to suppress evidence. The defendant asserts that the denial of those motions was error, and argues several grounds in support of that assertion. He contends that the blue velour sweater and the three shirts were illegally obtained by the police at the Carew Cleaners. He further contends that since the results of tests on these items of clothing were the only evidence which could have afforded probable cause for his arrest and for the search warrant for his apartment, the black gloves he was wearing when arrested and the black pants and black shoes taken from his apartment should in turn have been suppressed.

The asserted illegality of the seizure of the clothes at the cleaners is that the police violated the defendant's rights under the Fourth Amendment to the United States Constitution in that they lacked probable cause to believe that

the clothes were connected with a crime, and that the seizure was made without a warrant or the defendant's consent and was not incident to a lawful arrest. The defendant contends that the "fact that a person leaves bloody garments at a laundry, in and by itself, does not" afford probable cause for the seizure of the clothes. The stated proposition does not accurately represent the circumstances of this case. The police were investigating a particularly bloody murder. Within six hours of the discovery of the crime, a man who gave his name only as "Joe" and gave no address left a blood-covered sweater and other clothing at a cleaning establishment not far from the scene of the murder. These facts were sufficient to lead the police to believe that the clothing left at the cleaners would aid in the identification of the murderer. See *Warden, Maryland Penitentiary* v. *Hayden*, 387 U. S. 294, 307.

The principal argument of the defendant is that the clothing was inadmissible because it was seized without his consent and without a warrant. The judge found that no warrant was necessary. The defendant cites *Stoner* v. *California*, 376 U. S. 483, and *Corngold* v. *United States*, 367 F. 2d 1 (9th Cir.), in support of his contention that a warrant was needed. Neither of the cited cases is apposite here. *Stoner* v. *California* held that the permission of the hotel clerk did not remove the requirement for a warrant to search the defendant's hotel room. *Corngold* v. *United States*, the holding of which was later limited in *Gold* v. *United States*, 378 F. 2d 588 (9th Cir.), concerned a search by airline employees, alerted and assisted by Federal officers, of closed packages left with the airline for shipment. In the case before us no search was conducted at the Carew Cleaners. At most there was a "seizure" of items in plain view which were voluntarily surrendered by the person in rightful possession. Consequently, there was no necessity for a warrant. *Harris* v. *United States*, 390 U. S. 234, 236, and cases cited. When the defendant of his own volition transferred the clothes to Sorrell and pointed out the bloodstains, he took the risk that Sorrell would inform the police.

Cf. *Lewis* v. *United States*, 385 U. S. 206, 212; *Hoffa* v. *United States*, 385 U. S. 293, 302–303.

2. The defendant contends that despite the evidence of the sweater, the police had no probable cause to arrest him without a warrant at the Carew Cleaners, and that the pair of black gloves he was wearing at the time of his arrest and certain statements he made later at the police station should therefore have been suppressed. The circumstances leading to the arrest of the defendant have already been recounted. Several hours after the arrest, a police officer called the assistant clerk of the District Court, and related to the clerk the evidence that the police then had. There was some discussion about the issuance of a complaint for "suspicion of a felony," but ultimately the clerk advised the police officer to apply for a complaint for "vagrancy." The defendant was booked for vagrancy, and a complaint for that offence was issued the next day, Saturday. Concededly, there was no evidence supporting the charge of vagrancy, which eventually was dismissed for lack of prosecution. A complaint charging murder was issued on the following Monday.

The defendant argues that the words used by the arresting officer — "suspicion of the murder of Charles Alpert" — and the subsequent actions of the police and the assistant clerk of the court in charging the defendant with vagrancy, demonstrate that the police lacked probable cause to arrest him and instead arrested him on mere suspicion. The fact that the arresting officer used the word "suspicion" does not operate to convert probable cause to arrest, if it existed, into mere suspicion. "[T]he Commonwealth should not be conclusively bound or limited by the officer's choice of words made subjectively in the active execution of his duties." *Commonwealth* v. *Lawton*, 348 Mass. 129, 132. See *Ralph* v. *Pepersack, Warden, Maryland State Penitentiary*, 335 F. 2d 128, 134 (4th Cir.). Neither is it controlling that the police, on the advice of the clerk of the court, applied for a complaint charging vagrancy. Certainly the detaining of a suspect on a charge of vagrancy for the

purpose of conducting further investigation of another crime cannot be condoned. *Alegata* v. *Commonwealth*, 353 Mass. 287, 296–297. In *Mills* v. *Wainwright*, 415 F. 2d 787 (5th Cir.), the court held that fingerprints of a defendant, obtained while the defendant was under arrest for an admittedly groundless charge of vagrancy, could not, under the rule of *Davis* v. *Mississippi*, 394 U. S. 721, be admitted in evidence at the defendant's trial for robbery. It was held to be irrelevant that the police had, at the time the defendant was arrested for vagrancy, probable cause to arrest him for robbery. We need not decide on this record whether the rule of *Davis* v. *Mississippi* requires the result reached by the Fifth Circuit, i.e., that an arrest for a sham offence renders evidence obtained as a result of that arrest inadmissible even though there was in fact probable cause to arrest for the actual offence. (But see *Commonwealth* v. *Lawton, supra.*) The holding in the *Mills* case was carefully limited to the precise facts before the court, and *"it was while Mills was being detained on the vagrancy offense* that fingerprints were taken that connected him with the crime of which he was later convicted" (emphasis supplied). 415 F. 2d at 790. In the case before us, Perez was arrested at the Carew Cleaners on the charge of murder; the gloves were seized and the statements made before any discussion of a complaint for vagrancy.

The determinative question is whether, at the time of the arrest, "the officers had probable cause to make it — whether at that moment the facts and circumstances within their knowledge and of which they had . . . trustworthy information were sufficient to warrant a prudent man in believing that the . . . [defendant] had committed . . . an offense." *Beck* v. *Ohio*, 379 U. S. 89, 91. *Commonwealth* v. *Holmes*, 344 Mass. 524, 525. We are of opinion that the police had probable cause to arrest the defendant for murder at the time the arrest was made. The defendant had admitted ownership of clothing, including a blue sweater, that had been left at the cleaners within a few hours after Alpert's body was discovered. The arresting officer knew that blood,

rope fibers similar to the fibers of the rope found in the store, and particles of putty-like material had been found on the sweater. He also knew that the murderer had entered through a skylight and climbed down a rope. "'The substance of all the definitions' of probable cause 'is a reasonable ground for belief of guilt.' . . . And this 'means less than evidence which would justify condemnation' or conviction . . . ." *Brinegar* v. *United States*, 338 U. S. 160, 175.

3. The defendant's next assignment of error relates to the search of his apartment. At 4 P.M. on Friday, January 6, 1967, just after the defendant had been brought to the police station, Deputy Chief McCarthy, Lieutenant Moriarty, and Detectives O'Connor and Sears went to the defendant's residence at 47 Bradford Street, an apartment occupied by Pablo Burgos, an uncle of the defendant. The police were admitted by Burgos, who in response to their questions showed them a closet where Perez kept his clothes. Detectives O'Connor and Sears thereupon left for the District Court, where they applied for a search warrant. The affidavit in support of the application stated that "In the course of this investigation a search warrant was obtained to confiscate certain blood stained clothing from the Carew One Hour Cleaners at 2225 Main Street in Springfield belonging to a man who [*sic*] I now know as Jose Perez of 47 Bradford Street Springfield." The officers returned with a warrant to search the apartment. The clothing in the closet was taken to the police station, where Perez pointed out the black pants and black shoes as articles he was wearing when he had the fight.

Perez contends that since the police knew that the sweater and shirts had been taken from the cleaners before the first search warrant had been obtained, the above quoted statement in the affidavit for the second warrant was false, and rendered the search warrant for the apartment invalid. We assume, arguendo, that a deliberate misrepresentation made in an affidavit will render a search warrant invalid. See *United States* v. *Pearce*, 275 F. 2d 318, 321–324. See also *Rugendorf* v. *United States*, 376 U. S. 528, 531–533. We

find, however, no such defect in the affidavit. Apart from the immateriality of the statement complained of, there has been no clear showing that there was any misrepresentation at all. The testimony at the hearing on the motions to suppress indicates that the police were under the misapprehension that a warrant was necessary to justify continued retention or "confiscation" of the clothes taken from the cleaners. See point 1 above.

4. The defendant's assignment of error No. 5 asserts that the findings of fact made by the judge on the motions to suppress evidence were "contrary to the evidence" and were made "under erroneous standards of law." The judge's finding that the police could not have obtained a valid search warrant for the clothes at the Carew Cleaners because they did not know the name of the owner of the clothes, although erroneous,[2] was inconsequential in view of the finding that no warrant was necessary because Sorrell voluntarily gave the clothes to the police. See point 1 above.

The defendant argues that the judge should have held the arrest illegal because the findings of fact recite that "Lt. Moriarty arrested the defendant at the Carew Cleaners on January the 6th, this for suspicion of the commission of a felony." The word "suspicion" was used by the arresting officer. The term "reasonable suspicion" has also been used as an equivalent of "probable cause." See *People* v. *Brite*, 9 Cal. 2d 666, 687; *State* v. *Davis*, 50 N. J. 16, 23, fn. 3. In denying the motions to suppress, the judge specifically said that he was "satisfied that what was done here was reasonable . . . ." In view of the judge's denial of the motions to suppress, it cannot be argued that the judge's use of the term "suspicion" implied a finding of a lack of probable cause.

---

[2] General Laws c. 276, § 1, as appearing in St. 1964, c. 557, § 1, states that the court may, under certain conditions, "issue a warrant identifying the property and naming or describing the person or place to be searched . . . ." Section 2 provides, "Search warrants shall designate and describe the building, house, place, vessel or vehicle to be searched and shall particularly describe the property or articles to be searched for. . . ." Section 2B provides for the form of the supporting affidavit.

5. The defendant's sixth and seventh assignments of error relate to the denial of his motions for directed verdicts of acquittal. Concededly, there was little in the way of direct evidence introduced by the Commonwealth. After his arrest the defendant gave two somewhat different explanations of how blood came to be on his shirt and sweater. There was also testimony by the police admitted over the defendant's objection that when he was shown the rope at the police station he averted his eyes and that when he was accused of sliding down the rope and killing Alpert, he put his head in his hands. This kind of evidence, although it has its obvious limitations and frailties, has generally been held to be admissible in the discretion of the judge. It is discussed, with illustrations, in Wigmore, Evidence (3d ed.) § 273. Among the illustrations which reveal the principle of admissibility and the cautious use which the factfinder should make of it is the quotation from the charge of Shaw, C.J., to the jury at the trial of *Commonwealth* v. *Webster*, 5 Cush. 295.[3] There was no error in admitting the testimony.

We are of opinion, however, that the circumstantial evidence was sufficient to permit the jury to say that the guilt of the defendant was established beyond a reasonable doubt. On the defendant's blue sweater were found: bloodstains of the same blood type as the victim's; fibers which matched, both in composition and soiling, the fibers from the rope in the store; and granular material which matched the putty in the skylight when tested by X-ray. Bloodstains, putty and rope fibers were also found on the defendant's trousers. The paint chips and brass particles on the shoes led to the inference that the defendant had been in the hardware store, as did the putty, especially the large piece which appeared

---

[3] "Such are the various temperaments of men, and so rare the occurrence of the sudden arrest of a person upon so heinous a charge [as murder], that who of us can say how an innocent or a guilty man ought or would be wholly likely to act in such a case, or that he was too much or too little moved for an innocent man? Have you any experience that an innocent man, stunned under the mere imputation of such a charge, though conscious of innocence, will always appear calm and collected? Or that a guilty man who, by knowledge of his danger, might be somewhat braced up for the consequences, would always appear agitated? Or the reverse? Judge you concerning it." *Id* at p. 108.

to have been pressed against ribbed glass like that in the skylight.

The paint chip, brass filings, bloodstains and rope fibers found on the black glove from the river bank connected the glove to the murder scene. The blue cotton fibers, which were of the same color and type as the material of the defendant's sweater, connected the glove to the defendant. That the defendant when arrested was wearing new black gloves almost identical to the unusual type of glove found near the river, was another incriminating circumstance.

The defendant contends that much of this evidence was "neutralized" by other evidence, with the result that "the proof would be equivocal and fail in the character of conclusiveness . . . .," citing *Commonwealth* v. *Webster,* 5 Cush. 295, 314. The defendant introduced evidence that his blood was also type A, and that he had received a bloody nose in a fight the Saturday before the murder. He introduced evidence that the floor of his place of employment was scattered with brass filings, and that he and his uncle had painted their apartment in December, 1966. Paint chips taken from the apartment and the defendant's place of employment showed most or all of the colors found on the safe door, although in varying layer sequences. The defendant also points out that despite the bloody footprints, no blood was found on the soles or heels of his shoes; no blood was found on the rope fibers or putty on his shirt; and no plaster of paris was found anywhere on his clothing, although some had been spilled at the murder scene.

The defendant, citing *Commonwealth* v. *Polian,* 288 Mass. 494, 501, contends that because the State police chemist repeatedly used the phrase "consistent with" in his comparisons of the various materials, his testimony was not affirmative evidence that the materials were from the same place. The testimony referred to in the *Polian* case related to whether an abortion could have been performed on a woman. That the condition of her organs was consistent with an abortion was held not to be affirmative evidence that a criminal operation had been performed. See *Common-*

*wealth* v. *Donoghue,* 266 Mass. 391, 395–396, cited as authority in the *Polian* case. The phrase "consistent with" in the present case referred to the fact that expert analysis showed that various of the materials on the defendant's clothing were similar in their physical or chemical characteristics to materials found in the hardware store. The findings of the chemist were competent evidence.

As we have had occasion to say, in dealing with a great many similar cases, citing *Commonwealth* v. *Webster,* 5 Cush. 295, 319, "There was a case for the jury." *Commonwealth* v. *Eppich,* 342 Mass. 487, 491–493. *Commonwealth* v. *Medeiros,* 354 Mass. 193, 197. *Commonwealth* v. *Mangum, ante,* 76, 86. Further elaboration is unnecessary.

6. After the case had been submitted to the jury, the foreman returned with a request for further instructions on circumstantial evidence. The phrasing of the question indicated some confusion as to the meaning of "proof beyond a reasonable doubt." The judge reiterated his instructions on that issue. The defendant contends that the supplemental instructions were incorrect and misleading "as to the meaning and effect of circumstantial evidence and as to the concept of reasonable doubt." The major portions of the charge on both issues were drawn from *Commonwealth* v. *Webster,* 5 Cush. 295, 319–320. We perceive nothing in the judge's own language that confused or derogated from the definitions in the *Webster* case.

7. We have reviewed the whole case pursuant to our duty under G. L. c. 278, § 33E. There was no error.

*Judgments affirmed.*