## Commonwealth *vs.* Robert B. Bregoli.

Middlesex. January 4, 2000. - April 20, 2000.

Present: Marshall, C.J., Abrams, Lynch, Greaney, & Cowin, JJ.

*Practice, Criminal,* Required finding, Discovery, Argument by prosecutor, Disclosure of evidence, New trial, Capital case. *Homicide. Evidence,* Hearsay, Prior misconduct, Impeachment of credibility. *Witness,* Impeachment.

Evidence at the trial of an indictment for murder in the first degree was sufficient to support the jury's conclusion that the defendant was the killer of his former wife and that he acted with malice and deliberate premeditation. [268-270]

At the trial of a murder indictment, the asserted failure of the prosecutor to disclose certain statements of the defendant, later admitted in evidence through the testimony of various witnesses, did not constitute reversible error, where the defendant made no showing that he was prejudiced at trial by the nondisclosures. [270-272]

At a murder trial in which the Commonwealth argued that the defendant had possessed information only the killer would have known, the defendant should have been permitted to elicit from a witness on cross-examination that the witness was privy to details concerning the murder and what the details were; however, the error was not prejudicial where the witness's information was relatively insignificant in light of information, available only to the killer, that the defendant had revealed to others. [272-274]

At the trial of a murder case, there was no error in the judge's exclusion of evidence of a bad act of a Commonwealth witness, the victim's boy friend, offered to show that the boy friend had committed the murder, where the bad act was not similar to the particular method of killing used in the murder; nor could the evidence of bad acts be used to impeach the boy friend. [274-275]

In closing arguments in a murder case, the prosecutor improperly argued evidence substantively that the judge had explicitly limited, improperly asked a rhetorical question drawing attention to the defendant's failure to call a forensic witness, which could have been perceived by the jury as shifting the burden of proof, and improperly appealed to the jury's sympathy: however, the judge's instructions cured any harm, with respect to the first two errors, in light of the strong evidence against the defendant, and, with respect to the third, to which the defendant did not object, any harmful rhetorical effect was negligible in the context of the entire argument. [277-279]

A Superior Court judge correctly denied a criminal defendant's motion for a new trial based on the Commonwealth's failure to disclose a police report,

where the judge concluded that the information contained in the report, even had it been timely disclosed, would not have influenced the jury or provided a significant aid to the defendant's case. [280]

INDICTMENT found and returned in the Superior Court Department on March 31, 1994.

The case was tried before *R. Malcolm Graham*, J., and a motion for a new trial was heard by him.

*Eileen D. Agnes* for the defendant.

*David W. Cunis*, Assistant District Attorney (*Richard D. Grundy*, Assistant District Attorney, with him) for the Commonwealth.

MARSHALL, C.J. The defendant, Robert B. Bregoli, was convicted of murder in the first degree of his former wife on a theory of deliberate premeditation. He filed a motion for a new trial, which the trial judge denied without an evidentiary hearing. The defendant's appeal from that order has been consolidated with his direct appeal. He challenges (1) the denial of his motion for a required finding of not guilty; (2) certain evidentiary rulings on the ground that the prosecutor failed to disclose testimony (recounting oral statements of the defendant) in violation of a pretrial discovery agreement; (3) the judge's refusal to admit extrajudicial statements of a witness during the defendant's cross-examination of her; (4) the judge's denial of the defendant's request to introduce evidence of a subsequent bad act of a Commonwealth witness; (5) numerous comments in the prosecutor's closing argument as improper; and (6) the denial of his motion for a new trial. The defendant also seeks relief under G. L. c. 278, § 33E. We affirm the conviction and the order denying the motion for a new trial, and conclude that no relief under G. L. c. 278, § 33E, is warranted.

1. *Facts.* We summarize the evidence in the light most favorable to the Commonwealth, reserving certain details for discussion in connection with the issues raised.

The victim and the defendant had been married and divorced twice, most recently in August, 1993. Subsequently, they maintained a troubled relationship with one another, marked by periods of separation and reconciliation. At various times the victim had obtained orders against the defendant restraining him from abusing her. There was evidence of the defendant's growing rage toward and obsession with the victim following their

second divorce. The defendant stalked her, telephoned her repeatedly, and made threatening statements about her to others.[1] In early 1994, the victim began dating another man. This enraged the defendant, who referred to the man by racial epithets and as a "drug dealer." On several occasions, the defendant directed racial slurs and made menacing gestures toward the victim and her boy friend. Following one such confrontation, the defendant told a friend, John Furtado, that he hated the victim; several times he said that he "was going to kill her."

On the day of the victim's death, she had been planning to move into a new apartment with her boy friend; the two spent the morning moving some of the victim's possessions. At approximately 3 p.m. they met two friends at a local club. Shortly afterward the victim departed alone, to meet with her new landlord. She was last seen alive at approximately 4 p.m. by the landlord as she left his office. Her body was discovered at approximately 5 p.m. in her old apartment when her boy friend and two companions came to assist her in her move, as they had arranged earlier. The police found no evidence of a forcible entry or a struggle.

On the evening of the murder, the defendant, who was employed as a night watchman, did not work. He joined a friend at a bar later that evening, arriving there at approximately 9:30 p.m. He spoke to Furtado by telephone from the bar. When Furtado told him of the victim's death, he expressed little or no sadness; his response was, "Fuck her." Despite Furtado's pleas, he refused to leave the bar, and stayed out drinking until approximately 12:30 a.m.

The day after the murder the defendant arrived at the house of a friend, Margaret Pierce. He talked to her about the victim's death. At one point he put both hands around Pierce's neck, with four fingers on one side and the thumb on the other, and said, "Do you know how precious a woman's life is that it could be taken in a minute, just like this?"[2] He then made a

---

[1]On one occasion, the defendant stated, "Sometimes I feel like I should just take a gun and shoot her and then shoot myself." On another, he said, "I can kill her with my bare hands." He told one witness, "If I can't have her, nobody is going to have her." He also said he hated the victim and that he was "going to do something about it."

[2]There was evidence that the defendant, a student of karate and an enthusiast of martial arts, was familiar with, and skilled in, potentially lethal choke holds.

snapping sound. He continued to apply pressure to her neck until Pierce protested. A mutual friend, Lori Gerwaski, arrived at Pierce's home shortly after this incident. While describing an earlier incident with the victim's boy friend, the defendant grabbed Gerwaski's neck in the same manner: with four fingers on one side and the thumb on the other. Later that evening, while teaching Pierce's son a martial art neck hold, the same one he earlier had used on Pierce and Gerwaski, the defendant said, "This is how you kill someone," as he held the boy's neck in the choke hold.

The medical examiner determined the cause of death to be strangulation. She identified three internal hemorrhages to the right side of the victim's neck and one on the left side and fractures of her neck bones. She opined that the victim's injuries were consistent with a hold on the neck, four fingers being placed on the right side of the neck and the thumb being placed on the left side of the neck. Small abrasions on the victim's face were consistent with something being placed over her face, possibly in an effort to suffocate her.

2. *Motion for a required finding of not guilty.* Noting that there was no direct evidence placing him at the murder scene, the defendant challenges the sufficiency of the evidence to support a verdict of deliberately premeditated murder in the first degree. A lack of direct evidence of contact between the defendant and the victim at the time of the murder does not render the evidence insufficient. *Commonwealth* v. *Marquetty*, 416 Mass. 445, 452 (1993), citing *Commonwealth* v. *Perez*, 357 Mass. 290, 305 (1970). Rather, we consider whether "the evidence, considered in the light most favorable to the Commonwealth, was sufficient to satisfy a rational trier of fact of the essential elements of the crime beyond a reasonable doubt." *Commonwealth* v. *Coonan*, 428 Mass. 823, 828 (1999).

There was compelling evidence of the defendant's particular knowledge of how to kill by strangulation, of motive, and of opportunity, from which the jury could have concluded beyond a reasonable doubt that the defendant, and none other, killed the victim. He knew how to inflict the type of injury consistent with the one that killed the victim: a neck hold called a "crab

strike."[3] His karate instructor earlier had seen him use that lethal strike, and the defendant used a similar choke hold on three different people the night after the murder. This was before the Commonwealth made public the cause of death.

Multiple witnesses testified that the defendant's one-time love for the victim evolved into hatred marked by rage and obsession, which intensified when she began dating a black man. He made numerous statements to the effect that he wanted to kill the victim and that he did not want her to be with anyone else if he could not have her. See *Commonwealth* v. *Squailia*, 429 Mass. 101, 106-107 (1999) (evidence of threats, acts of physical violence, defendant's statements that he planned to kill victim, and, "If I can't have her no one will" probative of state of mind). Shortly before the murder, the defendant told a close friend, Furtado, that he was going to kill the victim. Cf. *Commonwealth* v. *Salim*, 399 Mass. 227, 232-233 (1987) (defendant told others he would kill victim). The defendant made numerous hostile statements concerning the victim. The day after the murder Furtado confronted the defendant and asked whether he had killed the victim. The defendant paused before answering, "Fuck her, she was trying to kill me." Furtado repeated his question; the defendant gave the same answer, but added, "She won't be fucking no more niggers."

Finally, there was evidence from which the jury could infer that the defendant had the opportunity to commit the crime. The defendant monitored the victim's movements. He knew how to access her telephone answering machine. He had a copy made of the key to her apartment. He made and received several telephone calls the afternoon and early evening of the murder, and told two friends he "just got up." He later asked one friend to give investigators an alibi if asked about the defendant's whereabouts that day. Cf. *Commonwealth* v. *Nadworny*, 396 Mass. 342, 348-349 (1985), cert. denied, 477 U.S. 904 (1986).

As to malice, the evidence of death by strangulation supported an inference that the victim's death was not instantaneous, but the result of pressure applied to her neck until she lost consciousness. See *Commonwealth* v. *Forde*, 392 Mass. 453, 456 (1984) (similar evidence; without more, sufficient to raise inference of malice). Moreover, the compelling evidence of the

---

[3]The "crab strike" is a dangerous, one-handed hold in which the fingers and the thumb are placed on opposite sides of a person's neck, and the neck is pinched or squeezed, usually resulting in death.

defendant's obsessive and increasingly hostile attitude toward the victim supported such an inference.

There was evidence of premeditation in the many statements the defendant made about wanting to kill the victim, in his statement to Furtado that he would kill her, and in the other indications of increasing hostility toward her. The method of death — sustained pressure to the victim's neck — also warranted such a finding. See *Commonwealth* v. *Stockwell*, 426 Mass. 17, 19 & n.2 (1997). In short, viewed in the light most favorable to the Commonwealth, there was sufficient evidence to support the jury's conclusion that the defendant was the killer and that he acted with malice and deliberate premeditation.

3. *Alleged discovery violations.* The defendant argues that the Commonwealth violated a pretrial discovery agreement (see Mass. R. Crim. P. 14, 378 Mass. 874 [1979]) by the prosecutor's failure to disclose certain statements of the defendant, later admitted in evidence through the testimony of various witnesses.[4] Admission of undisclosed statements subject to a discovery agreement is reversible error only if the defendant makes a "showing that [he] was significantly prejudiced at trial by the [non]disclosure," or if he shows "how a new trial would substantially cure any error." *Commonwealth* v. *Cundriff*, 382 Mass. 137, 150 (1980), cert. denied, 451 U.S. 973 (1981). We examine each of the challenged statements and conclude that the record does not support any such claim. See *id.* at 151.

(a) The defendant contends that the prosecutor failed to disclose testimony by the victim's boy friend that the defendant called him a "nigger" and used other "dirty words." The defendant did not object to, or move to strike, the testimony, suggesting that these comments did not surprise him.[5] Cf. *Commonwealth* v. *Richenburg*, 401 Mass. 663, 671 (1988) (failure to request continuance undermines claim that counsel would have

---

[4]The Commonwealth, in the pretrial conference report, had agreed to provide the defendant with the "substance of any oral statements not yet reduced to writing alleged to have been made by the defendant which are either exculpatory or which the Commonwealth intends to introduce into evidence at trial." See Mass. R. Crim. P. 11 (a) (2) (A), 378 Mass. 862 (1979).

[5]Defense counsel did object at one point during the relevant testimony. The objection, however, was directed toward alleged hearsay statements made by the victim that the boy friend was about to repeat and not to the testimony that the defendant called him "nigger."

taken different course on cross-examination had he received inculpatory information earlier). Even if the discovery agreement were breached, of which we are doubtful,[6] we do not think any failure to disclose could have prejudiced the defendant. There was ample testimony from other witnesses that the defendant had directed racial slurs at the boy friend, including the use of the word "nigger." Nor can the defendant reasonably claim surprise at hearing that he used hostile language during a confrontation with the boy friend. He has not shown how prior notice would have improved his cross-examination of that witness. See *Commonwealth* v. *Gilbert*, 377 Mass. 887, 895 (1979).

(b) The defendant objects to the admission of testimony of John Furtado that the defendant told him that the victim "won't be fucking no more niggers." The defendant also did not object to this testimony. See *Commonwealth* v. *Richenburg, supra.* There was no error in admitting that statement. Furtado made substantially similar statements in his testimony before the grand jury, which was made available to the defendant.[7] It is not a violation of a pretrial discovery agreement if a witness's testimony "differs somewhat" from a report provided to the defense. See *id.* at 672, citing *Commonwealth* v. *Rose*, 13 Mass. App. Ct. 951, 953 (1982). Witnesses cannot be required to use at trial the precise words used in a prior statement. Counsel, in turn, cannot be expected to know or anticipate every slight variance in the testimony of a witness. There is no suggestion that the prosecutor knew, before Furtado took the stand, that his testimony would vary in any respect at all from his grand jury testimony. Moreover, defense counsel could — and did — cross-examine Furtado on any inconsistencies between his grand jury and trial testimony. *Commonwealth* v. *Richenburg, supra.*[8]

(c) The defendant objects to the testimony of Margaret Pierce

---

[6]Testimony by the boy friend that the defendant used "dirty words" is not a "statement" of the defendant, but is more properly viewed as a characterization of the defendant's language.

[7]In his grand jury testimony, Furtado said that the defendant made racial slurs. He testified that he told the defendant that "you can't attack [the boy friend's] race." Furtado also told the grand jury that the defendant said, "She's fucking a nigger," and that the defendant "was obsessed with this race thing." He also told the grand jury that the defendant said he would kill the victim, in the context of his anger at her relationship with her new boy friend.

[8]The defendant also contends that the Commonwealth did not disclose before trial Furtado's testimony that the defendant had made a copy of the key

concerning six assertedly undisclosed statements allegedly made
by the defendant.[9] Three of these statements do not violate the
discovery agreement because they were not covered by the
pretrial agreement,[10] were disclosed to the defendant,[11] or were
but a slight variation of disclosed statements.[12] As to the remain-
ing statements, to each of which the defendant did object, they
were cumulative of other evidence at trial that we need not
recite here.[13] Even if the statements were exculpatory, which
they assuredly were not, we discern no significant prejudice to
the defendant. Cf. *Commonwealth* v. *Tucceri*, 412 Mass. 401,
414 (1992) (if undisclosed exculpatory statements cumulative of
other testimony do not "carry a measure of strength in support
of the defendant" to influence the jury, failure to disclose does
not warrant granting new trial).

4. *Refusal to admit extrajudicial statements*. The judge did

to the victim's apartment. There was no objection or motion to strike this
testimony. If the statement was undisclosed, the defendant has failed to show
how any failure significantly prejudiced him.

[9]Pierce testified that (1) the defendant said that "he thought the police had
seen him watching [the victim] at the parking lot at the hospital, and asked if
[she would] say that he was with me"; (2) the defendant had said he needed
to keep the victim on his good side because the victim was going to testify
against the defendant in a criminal proceeding; (3) the defendant said, the day
after the murder, "Why don't I feel anything? I don't feel anything"; (4) the
witness's observation that the defendant was "mellow about [the victim's
death]"; (5) the defendant knew that the victim was moving in with her boy
friend on the same day as the murder; and (6) the defendant asked, "Why
would she pick that black Dominican fuck drug lord over me?"

[10]Pierce's testimony that the defendant was "mellow" is Pierce's observa-
tion of his demeanor; observations were not covered by the discovery agree-
ment.

[11]A statement all but identical to the testimony, "Why would she pick that
black Dominican fuck drug lord over me?," was disclosed to the defendant
both in a police report and in grand jury testimony.

[12]The statement that the victim and her boy friend were moving in together
on March 5, the day of the murder, was but a slight variance from the
defendant's admitted knowledge that the two were planning to live together.

[13]The defendant also complains that the judge allowed allegedly undisclosed
statements by Kyle Regan and Paul Furtado, the defendant's karate instructor,
to be admitted improperly. Regan testified to an incident in which the victim's
new tires that the defendant had purchased for her, were "slashed." Regan's
*testimony did not* include an "oral statement[] . . . made by the defendant"
and therefore was not covered by the discovery agreement. The karate instruc-
tor testified that the defendant had knowledge of the karate neck hold called
the "crab strike." The instructor's statement of March 7 was provided to the
defense. See *infra*.

not permit the defendant, during his cross-examination of Louise Tassinari, a Commonwealth witness, to elicit certain statements that the defendant claimed had been made to her by Furtado. The judge excluded the testimony as hearsay. The defendant argues that the excluded statements were offered not to prove the truth of their content but to show that the defendant had knowledge of the circumstances of the victim's death from an independent source, rebutting the Commonwealth's claim that he knew certain facts only because he was the killer. Defense counsel informed the judge that Tassinari would testify that Furtado told her information concerning cause of death and how the body was found, knowledge that the Commonwealth relied on to demonstrate that the defendant had specific knowledge of the murder only the killer could have.

"An extrajudicial statement is not hearsay when offered to prove that the person to whom it was addressed had notice or knowledge of the contents of the statement." P.J. Liacos, Massachusetts Evidence § 8.2.2, at 466 (7th ed. 1999). A defendant's knowledge of the contents of the statements must be directly relevant for them to be admissible on this basis. See *Commonwealth* v. *Pleasant*, 366 Mass. 100, 103 (1974). Where the Commonwealth argues the defendant possessed information only the killer would have known, we think it material that others had heard statements concerning that same knowledge. The defendant should have been permitted to show that Tassinari had heard from Furtado details concerning the murder, and what those details included.

The defendant objected to the exclusion of the testimony. We therefore consider whether "the error did not influence the jury, or had but very slight effect." *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994), quoting *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983). The error was not prejudicial. In addition to the relatively insignificant fact that Tassinari learned from Furtado that the victim went home to pack her belongings (and by inference the defendant could have learned this from Furtado as well),[14] the Commonwealth relied on other statements made by the defendant to another witness about the position of the victim's body and the manner of death,

---

[14]The defendant does not claim that either Tassinari or Furtado passed information on to him.

before the police had released that information.[15] There was no claim by the defendant that either Tassinari or Furtado (or anyone else) knew anything of those subjects. The jury had available to them the defendant's statements of the victim's position and his knowledge of the manner of death as proof of the Commonwealth's claim that he had access to information available only to the killer.

5. *Subsequent bad acts of a Commonwealth witness.* The defendant sought to admit evidence that, five months after the murder, the victim's boy friend was arrested for pushing his then girl friend out of a vehicle, grabbing her by the throat. The defendant says that this was exculpatory evidence, pointing to the boy friend as the killer.

A defendant may "introduce evidence that another person recently committed a similar crime by similar methods, since such evidence tends to show that someone other than the accused committed the particular crime." *Commonwealth* v. *Jewett*, 392 Mass. 558, 562 (1984). Such evidence may only be admitted when the acts of the other person are "so closely connected in point of time and method of operation as to cast doubt upon the identification of [the] defendant as the person who committed the crime." *Commonwealth* v. *Scott*, 408 Mass. 811, 816 (1990), quoting *Commonwealth* v. *Keizer*, 377 Mass. 264, 267 (1979). Whether the evidence sought to be admitted meets that test is in the discretion of the trial judge. *Commonwealth* v. *Scott*, *supra*. In this case, the judge correctly exercised his discretion to exclude the testimony. The act of grabbing a person by the neck is not sufficiently similar to the lethal "crab strike" that the jury could infer killed the victim: the only feature common to both is the placement of hands on the neck. The victim was killed by a sustained force to the Adam's apple area of her neck. The boy friend's act was quite different: he did not attempt to strangle his girl friend, but allegedly grabbed her neck as a means of pushing her out of the car. Moreover, evidence of the boy friend's later conduct could not have cast serious doubt on the identity of the killer: there was unrebutted evidence that the boy friend was with friends continuously from ap-

---

[15]In closing arguments, the Commonwealth relied on Margaret Pierce's testimony that, while grabbing her neck, he asked, "Do you know how precious a woman's life is . . . ?" In the same conversation the defendant, referring to a suggestion in a news report that the victim's body had been moved, said to Pierce that the victim had been "just sitting there like this."

proximately 3 P.M., when the victim was still alive, until the victim's body was discovered at approximately 5 P.M.

The defendant was also not entitled to use the incident to impeach the boy friend. In general, a witness cannot be impeached by use of a specific act of misconduct not resulting in a conviction. See *Commonwealth* v. *LaVelle*, 414 Mass. 146, 151 (1993); P.J. Liacos, Massachusetts Evidence, *supra* at § 6.10.3. A criminal case against the boy friend was not pursued, and we see no reason to deviate in this case from our general rule.

6. *Closing argument.* The defendant challenges numerous statements in the prosecutor's closing argument that, he argues, taken separately or cumulatively require reversal of his conviction. The defendant alleges, with varying degrees of merit, that the prosecutor (1) once improperly commented on the defendant's right to remain silent; (2) three times improperly commented on the defendant's failure to present evidence; (3) vouched for the credibility of a Commonwealth witness; (4) violated a limiting instruction; (5) appealed to the jury's sympathy; and (6) three times misstated the evidence. We can dispose summarily of all but three of his claims.

The first claim[16] has no merit. The defendant did not remain silent; he answered a question posed to him by his close friend, John Furtado. It was proper for the prosecutor to argue that it would have been natural for an innocent man to deny guilt to a close friend.

As to the second claim, that the prosecutor improperly commented on the defendant's failure to present evidence, we here address two of the comments. The first comment[17] was a proper reflection on the strength of the Commonwealth's case and the weakness of the defendant's case. See *Commonwealth* v. *Feroli*, 407 Mass. 405, 409 (1990) (prosecutor free to comment on strength of Commonwealth's case and weakness of defendant's case). Even if the comment is an "oblique reference" to the

___

[16]The defendant claims the prosecutor improperly commented on his right to remain silent by referring to the defendant's prearrest statement made to his friend, John Furtado. Furtado testified that, when he asked the defendant if he had killed the victim, the defendant said only, "Fuck her, she was trying to kill me." Defense counsel did not object to the prosecutor's comment.

[17]The prosecutor stated: "Defense presented a case to you, and that case, Ladies and Gentlemen, provided no explanation for the grabbing of [Margaret] Pierce's neck."

defendant's failure to present evidence, the defendant was not prejudiced. *Commonwealth* v. *Walker*, 413 Mass. 552, 560 (1992). The judge forcefully instructed the jury on the Commonwealth's burden of proof so any slight error was neutralized. The challenge to the second prosecutorial comment[18] also is without merit. There was ample testimony that people other than the defendant had discussed the details of the victim's death soon thereafter. Because the defendant sought to establish an inference that John Furtado had told him information the Commonwealth claimed was known only to the killer, the prosecutor was free to comment on the weakness of this inference. See *Commonwealth* v. *Feroli, supra.*

There is no merit to the third claim that the prosecutor vouched for the Commonwealth's witness, John Furtado.[19] Defense counsel spent considerable time attacking Furtado's credibility, and the prosecutor could respond by referring to Furtado's earlier and consistent grand jury testimony.[20] See *Commonwealth* v. *Smiledge*, 419 Mass. 156, 160 (1994).

His sixth claim that the prosecutor three times misstated the evidence is also without merit. First, the defendant argues the prosecutor "invented" a conversation between the victim and the defendant at the scene of the killing.[21] This was permissible

---

[18]The prosecutor made the following statement, to which there was no objection:

> "The defense asks you not to speculate, but then they'll tell you the whole town was talking about this, talking about that, talking about the other thing. Maybe the defendant picked up some of that, but you didn't hear any of that as evidence."

[19]The prosecutor argued:

> "Where's the motive for John Furtado to lie about his friend? Is there a question as to whether John Furtado was a reluctant witness, how forthright he was going to be with law enforcement, his prior dealings with law enforcement; is there a question about that? You heard that [the witness] was spoken to on numerous occasions by the police and then he was given a Grand Jury subpoena. He was brought into the Grand Jury and said the things that he said to you."

[20]Contrary to the defendant's assertion, the prosecutor did not at any time state that he knew that Furtado's testimony was truthful. Cf. *Commonwealth* v. *Marangiello*, 410 Mass. 452, 463-465 (1991).

[21]The prosecutor argued:

argument. The prosecutor told the jury that they could reasonably infer these statements from the evidence; he did not suggest to the jury that the victim actually spoke them. See *Commonwealth* v. *Kozec*, 399 Mass. 514, 516 (1987). Next, the defendant argues that the prosecutor misstated the evidence when he commented that the defendant grabbed Lori Gerwaski on the neck with "the same hold" that killed the victim, adding the victim "was just sitting there." The prosecutor's statements were a permissible comment on the evidence; he said that his summary was "one interpretation . . . you can accept it, you can reject it."[22]

The defendant's last claim that we may dismiss summarily involves Margaret Pierce's testimony that the defendant grabbed her neck with two hands. During closing argument the prosecutor referred a number of times to Pierce's testimony as he demonstrated to the jury a one-handed, rather than two-handed, choke hold. There was substantial evidence supporting the inference that the defendant strangled the victim using a one-handed martial arts hold with which he was familiar. This slight variation from Pierce's testimony was not sufficient enough to raise any legal concern.

We now address three remaining claims that are problematic. The defendant argues that the prosecutor violated an order of the judge concerning a prior assault by the defendant on the victim in 1990; the judge limited the use of this evidence to the "nature of the relationship between the [d]efendant and [the victim] at the time of her death." In his closing argument, the prosecutor, however, used the evidence substantively, drawing the jury's attention to the similarities of the injuries to the victim's face in the 1990 incident and the murder, and to the

---

"What do you think the first thing [the victim] said when she was confronted by the defendant in her apartment . . . She knew that those people were right behind her. *Reasonably you can infer* that she told him that, 'They think I'm just getting boxes and be right there.' " (Emphasis supplied.)

[22]The Commonwealth concedes that the prosecutor made a minor misstatement of the evidence to the effect that Gerwaski testified that, as he grabbed her neck, the defendant had said to her that the victim "was just sitting there." It was in fact Pierce who testified to that effect. Because the prosecutor, earlier in his closing, accurately related Gerwaski's testimony, the misstatement could not have affected the jury.

defendant's threat of using martial arts against the victim in the 1990 incident.[23] Defense counsel objected. The prosecutor's argument was improper.[24] The prosecutor asked the jury to infer that the defendant was an individual capable of utilizing a unique and deadly martial arts move, and that he had made threats against the victim to do so in the past. See *Commonwealth* v. *Johnson*, 412 Mass. 318, 321-324 (1992) (prosecutor may not present to jury evidence admitted for limited purpose as if it were substantive evidence); *Commonwealth* v. *Rosa*, 412 Mass. 147, 156-159 (1992), and cases cited (same). We view with displeasure the improper use made by experienced trial counsel of the evidence in the face of the judge's explicit limitation on the use of the evidence. We nevertheless do not think that the attempt had any influence on the jury, or if it did, the effect was minimal. Contrast *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994). During his instructions to the jury, the judge reiterated that the evidence of the 1990 incident could be used by the jury for a limited purpose only, ensuring that any prejudicial effect was neutralized. Moreover, the evidence against the defendant was strong regarding his obsession with the victim and his statements made before and after her death concerned with his threats to kill her. To similar effect was evidence that the defendant repeatedly linked his knowledge of a choke hold to the idea that use of the hold could be lethal.

The next claim concerns a rhetorical question the prosecutor posed to the jury as if he were defense counsel cross-examining

---

[23]The prosecutor stated: "I told you, Ladies and Gentlemen, in my opening, that you would see this murder built, that it didn't just happen. We went all the way back to 1990, and we started there. You recall [an officer] from the Natick Police Department testify to you and told you that the defendant, early in the marriage, just months into the marriage went to church and locked her in, according to [the victim]. What happened? [The victim] goes out to the parking lot and she's hit, she's kicked, and she's cut on the bridge of her nose. [The defendant] tells [the officer] he was going to use martial arts on her, that's what he threatened. What else do we know of [the victim's] having a cut on the bridge of her nose? Some insight into the defendant in that incident, too: 'She must have slipped and fell. Do you know why? She slapped me.' "

[24]The Commonwealth now asserts that the evidence was in fact admissible as substantive evidence. See *Commonwealth* v. *Scott*, 408 Mass. 811, 818 (1990) (prior bad acts may be admitted "to prove intent, motive, identity, pattern of operation, or common scheme"). The claim is misplaced, for the issue here concerns the terms on which the judge admitted the evidence in this trial.

the Commonwealth's medical examiner: "Do you agree with the statement that hyoid bones frequently fracture when falling down, as in this book that I am waving in front of the jury because we're not going to call an expert of our own?" The defendant argues that this impermissibly drew attention to his failure to call a forensic witness, shifting the burden to him to do so. The Commonwealth responds that the remark was but a wry comment on the defendant's attempt to impeach the medical examiner by using a medical text, which defense counsel had done. "As a general rule . . . rhetorical questions should not be used in closing argument where they could be perceived by the jury as shifting the Commonwealth's burden of proof to the defendant." *Commonwealth* v. *Habarek*, 402 Mass. 105, 111 (1988). The comment should not have been made. Any harm to the defendant, however, was cured by the judge. He instructed that "[t]he defendant never has any burden to prove his innocence or to produce any evidence or to testify." See *Commonwealth* v. *Amirault*, 404 Mass. 221, 236 (1989) (prosecutor's comment that included explicit reference to the defendant's failure to "tell his side of the case" was improper, but harm was cured by judge's instructions).

The defendant's final claim concerns the prosecutor's improper appeal to the jury's sympathy. The prosecutor argued: "Ladies and Gentlemen, the truth of any matter starts in your gut, in your heart, and it works its way to your head, and it lives and resides in your soul." The defendant did not object to this remark. The Commonwealth suggests that the comment was a proper reminder to the jurors that they should decide the case in their minds, not based on sympathies or "gut" reactions. While the statement may have been interpreted by the jury in that manner, reminding each juror that any decision would reside in their "soul," needlessly skirted the line between permissible and impermissible argument. In the context of the entire argument, however, the jurors likely recognized this one comment as a "rhetorical flourish," mitigating any harmful effect of the remark. *Commonwealth* v. *Hamilton*, 426 Mass. 67, 75 (1997). Defense counsel's failure to object may also be an indication that the remark "sounded less exciting at trial than appellate counsel now would have it seem." *Commonwealth* v. *Deveau*, 34 Mass. App. Ct. 9, 14 (1993). See *Commonwealth* v. *Kozec*, *supra* at 518.

7. *Motion for new trial.* The defendant argued to the motion judge that the Commonwealth had failed to disclose a police report dated March 22, 1994, in which a witness, the defendant's karate instructor, stated that the defendant was familiar with certain lethal choke holds.[25] On March 7, 1994, the same witness had made a similar statement to the police, a report of which was provided to the defendant in advance of trial. The defendant claims that he was prejudiced by the Commonwealth's failure to disclose the March 22 report because it contained information not found in the earlier report.[26] The judge found that the two reports contained essentially the same information: the March 22 statement differed only in that it named and described two particular types of choke holds that the defendant knew, the "naked strangle hold" and the "tiger's claw." Neither written police report contained the term "crab strike."[27]

The failure to provide the defendant with a copy of the March 22 police report was harmless. It was not the name of the neck hold that was critical to the Commonwealth's case, but rather the defendant's knowledge of how to use a choke hold to kill. The motion judge concluded that, even if the Commonwealth had provided the March 22 report in a timely fashion, the report or available evidence disclosed in it would not have influenced the jury or provided a significant aid to the defendant's case. See *Commonwealth* v. *Daye,* 411 Mass. 719, 731 (1992). We agree. The judge correctly denied the defendant's motion for a new trial on this ground.[28]

8. *Conclusion.* We have reviewed the record in accordance with our statutory obligation under G. L. c. 278, § 33E, and

---

[25]The Commonwealth agreed to provide the defendant with "[c]opies of all police reports/law enforcement reports generated in connection with this case" and "[c]opies of all statements or reports of interviews of potential witnesses conducted in this case."

[26]The March 22 report is similar to but more detailed than the March 7 statement.

[27]The instructor testified that he had not taught the defendant the "crab strike," but he had observed the defendant using it on another individual. The defendant claims this testimony was a surprise. We fail to see how disclosure of the March 22 report would have mitigated that surprise where the March 22 report did not mention the term "crab strike."

[28]The defendant also claims the judge abused his discretion in failing to hold an evidentiary hearing before denying the defendant's motion for a new trial and before allowing the Commonwealth's motion to expand the record where the expansion included the allegedly undisclosed March 22 statement. We defer in both respects to the exercise of discretion by the judge. See *Com-*

discern no substantial likelihood of a miscarriage of justice in the defendant's conviction. We see no reason to exercise our power to order a new trial or to reduce the verdict.

*Judgment affirmed.*

*Order denying motion for a new trial affirmed.*

---

*monwealth* v. *Licata,* 412 Mass. 654, 660 (1992). For essentially the same reasons stated above, there was no error.